IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JEFFREY KELLOUGH, EMILY KELLOUGH, WENDELL BOWSHER, BARBARA BOWSHER, BRIAN HEARN, KATHLEEN HEARN, SHIRLEY ACREE, JAMES ACREE, RITA BAKER, CASSANDRA BUTLER, ULYSEE TAYLOR, LEMORIA TAYLOR, DANA COFFMAN, JAMES MITCHELL, MARIETH MITCHELL, DONALD KOLANDER, KENNER NADERMANN, DORISONA NADERMANN, CHARLES RICHARDSON IRVING CUMMINGS, GRACE CUMMINGS, BONNIE JERNIGAN, CHARLES ORR, REBA ORR, JOHN WRIGHT, CLIFFORD KOLESKI, DONNA KOLESKI, PAIGE SMITH, WALTER WASHINGTON, VERONICA MAUCK, WILLIAM MAUCK, JOHN THOMAS THOMAS HAYNES, JAQUIE HAYNES, JEFFREY GAY, KAREN GAY, RAYMOND DAGE, STANLEY COMER, PATRICIA COMER, TROY THOMPSON, MARTHA THOMPSON, MAC WILLIAMS, COLLEEN WILLIAMS, RODNEY MEYER, KATHARINE MEYER, ALVIN CAPRIETTA, CHERYL JONES, LARRY SOUTH, JEANNE SOUTH-SHAWHAN, individually and on behalf of all others similarly situated, | **JURY TRIAL DEMANDED**<br><br>**Case No:** |
| Plaintiffs, | |
| v. | |
| WESTGATE RESORTS, LTD., L.P. a/k/a WESTGATE RESORTS, LTD., CENTRAL FLORIDA INVESTMENTS, INC., WESTGATE RESORTS, INC., WESTGATE GV SALES & MARKETING, LLC, WESTGATE VACATION VILLAS, LLC, and CFI RESORTS MANAGEMENT, INC., | |
| Serve all Defendants at: | |
|     Corporation Service Company<br>    221 Bolivar Street<br>    Jefferson City, MO 65101 | |
| Defendants. | |

## CLASS ACTION PETITION

COME NOW Plaintiffs, by and through undersigned counsel, and as representatives of a class of persons similarly situated, and for the Class Action Petition against the Defendants named herein, state as follows:

## INTRODUCTION

Defendants, various entities associated with the Westgate Branson Woods Resort in Branson, Missouri, Westgate Branson Lakes Resorts in Hollister, Missouri, Westgate Smoky Mountain Resort in Gatlinburg, Tennessee, Westgate Las Vegas Resorts in Las Vegas, Nevada, Westgate Myrtle Beach Oceanfront Resorts in South Carolina and Westgate Orlando Resorts in Orlando, Florida, use a high-pressure scheme that involves convincing prospective purchasers to buy into its vacation timeshare program while failing to adequately disclose material and legally required information to buyers.  Through this scheme, Defendants (a) fail to adequately provide legally required disclosures and (b) fail to provide purchasers with adequate access to their timeshares, as follows:

A.       Westgate fails to adequately provide customers with legally required disclosures.  Specifically:

1.       Westgate fails to adequately train and supervise its sales agents, fails to provide them with disclosures to give to prospective customers, and encourages them to lie to customers in the context of high-pressure sales pitches.

2.       Westgate relies on its closing agents to provide written disclosures, but then provides them with a closing folio to use that contains a "secret pocket" where

2

the closing officers can conceal legally required disclosures about the purchasers' rights, including their statutory right to rescind their purchase.

B.      Westgate fails to provide purchasers adequate access to their timeshares. Specifically:

      1.      Westgate fails to adequately disclose to purchasers that their timeshare interest will be subject to a "floating use" plan.

      2.      Westgate fails to adequately describe to purchasers the terms of the "floating use" plan.

      3.      Westgate's "floating use" plan fails to provide purchasers reasonable access to their timeshares.

As a result of the common scheme, Westgate owners are left paying thousands of dollars in purchase price, upgrade costs, and annual maintenance fees, all on timeshare units they are frequently unable to use as advertised, and rarely, if ever, are able to use as reasonably expected.

Westgate's aggressive business model relies on one essential premise: it makes money by selling shares in property units, not by customers using the weeks they have purchased in those units.  In fact, Westgate has a strong incentive to sell as many ownership shares as possible in a piece of property.  It can then further increase its profits by limiting owners' use of the units so they can be rented out by Defendants for additional profit or used by Defendants as sample units to sell timeshare properties to new buyers.  In this way, Westgate profits many times by selling and overselling

various interests in one piece of property: it can sell it repeatedly at a premium, rent it

repeatedly, and repeatedly use it as a tool to induce new sales—sometimes all at once.

Defendants uniformly fail to adequately disclose material facts to buyers and, as a

result, fail to deliver what buyers reasonably expect, all in violation of Missouri,

Florida, Nevada, and Tennessee common law and statutory law.

## **JURISDICTION AND VENUE**

1.      Subject matter jurisdiction is proper in this Court pursuant to Class Action

Fairness Act, 28 U.S.C. § 1332(d).

2.       This Court has both general and specific personal jurisdiction over

Defendants because Defendants have continuous and systematic general business contacts in

this District.  Defendants own, maintain, operate, collect payments, and/or derive revenue

from the sale of property in this District, and had contact with this District specifically with

respect to the events giving rise to Plaintiffs' and Class Members' claims.  Defendants have

purposefully and voluntarily availed themselves of this Court's jurisdiction by engaging in

and/or profiting from real property transactions in this District.

3.      This Court has both general and specific personal jurisdiction over

Defendants, including under Missouri's Long Arm Statute, V.A.M.S. § 506.500, et seq.,

because Defendants have continuous and systematic general business contacts in Missouri.

Defendants own, maintain, operate, collect payments, and/or derive revenue from the sale of

property in Missouri, and had contact with Missouri specifically with respect to the events

giving rise to Plaintiffs' and Class Members' claims. Defendants have purposefully and

4

voluntarily availed themselves of this Court's jurisdiction by engaging in and/or profiting from real property transactions in Missouri.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and the property that is the subject of this action is situated in this District. Westgate conducts substantial business in this District, has marketed, advertised, and sold timeshare properties in this District, and has caused harm to Class Members residing in this District.

5.      Any purported forum selection clause in the contract at issue in this case is invalid and unenforceable, to the extent that the contract at issue in this case, and/or each portion thereof, resulted from misrepresentation, fraudulent inducement, duress, abuse of economic power, or other unconscionable means.  The forum-selection clause at issue here is a contract of adhesion that Plaintiffs and members of the proposed class had no opportunity to negotiate and requiring Plaintiffs and members of the class to litigate in Defendants' choice of forum would be unjust.

## PARTIES

**Plaintiffs:**

6.      Plaintiffs Jeffrey Kellough and Emily Kellough are individuals, whose principal place of residence is 5816 Oak Springs House Springs, MO, 63051.

7.      Plaintiffs Wendell Bowsher and Barbara Bowsher are individuals, whose principal place of residence is 500 Raleigh Wilson Rd. Bowling Green, KY, 42101.

8. Plaintiffs Brian Hearn and Kathleen Hearn are individuals, whose principal place of residence is 228 Seidman Ave Staten Island, NY, 10312.

9. Plaintiffs Shirley Acree and James Acree are individuals, whose principal place of residence is 6652 Laurel Grove Road Denton, MD, 21629.

10. Plaintiff Rita Baker is an individual, whose principal place of residence is 71 Biltmore, Bluffton, SC, 29909.

11. Plaintiff Cassandra Butler is an individual resident of 4448 Livorn Loop, Myrtle Beach, SC, 29579.

12. Plaintiffs Ulysee Taylor and Lemoria Taylor are individuals, whose principal place of residence is 1406 Credit Hill Rd SW, Townsend, GA, 31331.

13. Plaintiff Dana Coffman is an individual, whose principal place of residence is 18452 Shawnee Heights Road, Overbrook, KS, 66524.

14. Plaintiffs James Mitchell and Marieth Mitchell are individuals, whose principal place of residence is 1234 East 98th St., Chicago, IL, 60628.

15. Plaintiff Donald Kolander is an individual, whose principal place of residence is 829 Green Lawn, Harrison, MI, 48625.

16. Plaintiffs Kenner Nadermann and Dorisona Nadermann are individuals, whose principal place of residence is 27376 Springfield Road, Waynesville, MO, 65583.

17.     Plaintiff Charles Richardson is an individual, whose principal place of residence is 151 West Ave, Owego, NY, 13827.

18.     Plaintiffs Irving Cummings and Grace Cummings are individuals, whose principal place of residence is 15 Hazel Rd, Beaufort, SC, 29906.

19.     Plaintiff Bonnie Jernigan is an individual, whose principal place of residence is 50261 Dan Taylor, Aberdeen, MS, 39730.

20.     Plaintiffs Charles Orr and Reba Orr are individuals, whose principal place of residence is 82 White Oak Rd, Newnan, GA, 30265.

21.     Plaintiff John Wright is an individual, whose principal place of residence is 2320 E Shady Brook, Wichita, KS, 67214.

22.     Plaintiffs Clifford Koleski and Donna Koleski are individuals, whose principal place of residence is 621 N. Oakwood Street, Griffith, IN, 46319.

23.     Plaintiff Paige Smith is an individual, whose principal place of residence is 28581 Gray Eagle Drive, Denham Springs, LA, 70726.

24.     Plaintiff Walter Washington is an individual, whose principal place of residence is 803 Cromwell Ave, Westchester, IL, 60154.

25.     Plaintiffs Veronica Mauck and William Mauck are individuals, whose principal place of residence is 316 Church St., New Alexandria, PA, 15670.

26.     Plaintiff John Thomas is an individual, whose principal place of residence is 2625 South 167 Circle, Omaha, NE, 68130.

27.     Plaintiffs Thomas Haynes and Jacquie Haynes are individuals, whose principal place of residence is 320 Main Street, Culloden, GA, 31016.

28.     Plaintiffs Jeffrey Gay and Karen Gay are individuals, whose principal place of residence is 4733 Old County Road, Morrisville, NY, 13408.

29.     Plaintiff Raymond Dage is an individual, whose principal place of residence is 16225 Panoramic View, Sherrill, IA, 52073.

30.     Plaintiffs Stanley Comer and Patricia Comer are individuals, whose principal place of residence is 440 Lee Lane Road, Roanoke, NC, 27870.

31.     Plaintiffs Troy Thompson and Martha Thompson are individuals, whose principal place of residence is 523 Ridge Mill Lane, Commerce, GA, 30529.

32.     Plaintiffs Mac Williams and Colleen Williams are individuals, whose principal place of residence is 4990 Ridgemoor Circle, Palm Harbor, FL, 34685.

33.     Plaintiffs Rodney Meyer and Katharine Meyer are individuals, whose principal place of residence is 6251 Gaynelle Rd, Tinley Park, IL, 60477.

34.     Plaintiffs Alvin Caprietta and Cheryl Jones are individuals, whose principal place of residence is 814 N Bentalou Street, Baltimore, MD, 21216.

35.     Plaintiffs Larry South and Jeanne South-Shawhan are individuals, whose principal place of residence is 1216 Destiny Circle, Annapolis, MD, 21409.

**Defendants:**

36.     Defendants are Westgate Resorts, Ltd., L.P., Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate GV Sales & Marketing, LLC, Westgate Vacation Villas, LLC, and CFI Resorts Management, Inc. (collectively referred to herein as "Westgate"[1]).

37.     Defendant Westgate Resorts, Ltd., L.P. ("Westgate Resorts, Ltd.") is an active limited partnership formed and operating in Florida under the name Westgate Resorts, Ltd., with an initial filing date of April 14, 1999, a principal office of 5601 Windhover Drive, Orlando, Florida 32819.  Its Missouri registered agent is Corporation Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

38.     At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Smoky Mountain Resort at Gatlinburg (the "Smoky Mountain Resort"), at 915 Westgate Resorts Road, Gatlinburg, Tennessee 37738.

39.     At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Branson Woods Resort at Branson (the "Branson-Woods Resort"), at 2201 Roark Valley Road, Branson, MO 65616.

---

[1] Plaintiffs allege claims against all Defendants as alter egos of one another, as explained more fully herein. To the extent any Defendant had a discrete, distinguishable role in causing the injuries alleged herein, such information is exclusively in Defendants' possession.

40.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Branson Lakes Resorts at Hollister (the "Branson-Lakes Resort"), at 750 Emerald Point Drive, Hollister, Missouri 65672.

41.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Las Vegas Resorts at Las Vegas (the "Las Vegas-Resort"), at 3000 Paradise Rd, Las Vegas, Nevada 89109.

42.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Myrtle Beach Oceanfront Resorts at Myrtle Beach (the "Myrtle Beach-Resort"), at 415 South Ocean Boulevard, Street 2, Myrtle Beach, South Carolina 29577.

43.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Orlando Resorts at Orlando (the "Orlando-Resort"), at 9500 Turkey Lake Rd, Orlando, Florida 32819.

44.    Defendant Westgate Resorts, Inc. is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  It is the general partner of Westgate Resorts, Ltd.

45.    Defendant Westgate GV Sales & Marketing, LLC, is a Florida limited liability company with its principal place of business at 5601 Windover Drive, Orlando, FL 32819.

46.    Defendant Central Florida Investments, Inc. ("CFI") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  On its website, Westgate Resorts, Ltd. states that it operates as a subsidiary of CFI.

47.    Defendant CFI Resorts Management, Inc. ("CFI Resorts Management") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819. It is the managing entity that manages the Resort.

48.    Defendant Westgate Vacation Villas, LLC is a Florida limited liability company with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819. It is the general manager of Westgate Resorts, Ltd.

49.    CFI, CFI Resorts Management, Westgate Resorts, Inc., and Westgate Vacation Villas, LLC all have the same President/Secretary, David A. Siegel, and the same Treasurer/Chief Financial Officer, Thomas F. Dugan.

50.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venture of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiffs and injured Plaintiffs.

51.    At all times herein mentioned, Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

52.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants.  Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

## FACTUAL ALLEGATIONS

### The Timeshare Industry

### 1.     Repeated Sales of the Same Property Drive the U.S. Timeshare Industry

53.     The U.S. timeshare industry was founded in the early 1970s, a period of economic stagnation and soaring energy costs, when hotel and resort developers struggled to sell full ownership condominium properties. Instead of selling an actual condominium, developers realized, they could sell "ownership shares" to many customers, each of which theoretically gives an owner the right to use the property (or a similar property) for certain amounts of time per year.

54.     This simple notion—dividing one condominium or resort property into "ownership shares" and selling it over and over again, to dozens of different buyers—is the fundamental concept that has given rise to the profitable modern timeshare industry. By selling a vacation timeshare unit incrementally, a timeshare developer makes far more money than if it sold the same unit to one buyer for the market price.  As an illustration, a timeshare developer can build 150 condominiums, each of which might sell for $200,000 on

the open market; using a timeshare approach, the developer could sell two-week timeshares in each unit, for a total of 26 "timeshares," for, say, $20,000 each.  By using the timeshare scheme, the developer's investment brings a return of $520,000—2.6 times greater than the $200,000 it would have grossed selling to one buyer.  (Westgate takes this scheme several steps farther: it sells many more than 26 timeshares in each unit, exponentially increasing its profits while knowing that the unit will rarely or never be available for purchasers to use them.)

55.     Timeshare business is booming. According to the Association of Vacation Owners, the size of the annual timeshare market is $9.2 billion, with 9.2 million American households owning some form of timeshare....In 2015, approximately 9.2 million American households owned timeshares.  There were 1,547 timeshare resorts in the United States, with approximately 200,720 units available to be divided up and sold repeatedly.  The timeshare industry sold $8.6 billion worth of timeshares to consumers in 2015, with an average sales price of $22,240 and average maintenance fees of $920. *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, *available at* http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howardnusbaum.pdf; see also Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," *New York Times*, January 24, 2016, *available at* https://www.nytimes.com/2016/01/24/business/ diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.

56.     The industry is currently experiencing a period of substantial growth.  Timeshare sales volume has increased by more than 33% since 2011, the industry reports,

13

an average of 7% annually. In the most recent year for which data is available, sales volume rose from $8.6 billion 218 in 2015 to $9.2 billion in 2016, a nearly seven percent increase. This is part of a seven-year growth trend: in 2015, sales volume increased by nearly 9%, the second-largest percentage increase since the housing market collapse of 2008 caused the Great Recession.

57.     While privately held corporations like Westgate exist in the timeshare marketplace, the sector is increasingly dominated by large, often publicly traded corporations that depend on the industry's inflated profit margins.

58.     These corporations, including Westgate, also loan money to consumers to finance the purchase.  They then convert the timeshare promissory notes into securities that are rated and sold in the financial markets.  In 2017, for example, Westgate issued $132,500,000 and $42,500,000 in Class A and Class B "Timeshare Collateralized Notes," respectively.  This year, Westgate issued another $197,850,000 in secured timeshare notes. Since 1992, it has sold approximately $3.4 billion in notes in the securitization market.

59.     The timeshare industry's record profits are driven by sales of ownership shares, not its customers' use and enjoyment of their properties. In fact, a timeshare business makes money every time someone makes a down payment or monthly payment on a timeshare, including paying steep annual "maintenance fees," but when people use the properties, it prevents the timeshare developer from renting that property to another customer or using it to entice a prospective purchaser to buy a timeshare.  Selling units to new customers and selling nicer units to existing customers is the lifeblood of the timeshare industry.

60.     The timeshare business has been a breeding ground for fraudulent sales tactics like those employed by Westgate as detailed herein.  Since its founding in the early 1970's, the industry has relied on "sneaky come-ons" to trap consumers in "multi-hour presentations complete with high-pressure sales tactics."  Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. In recent years, lawsuits and news reports have documented "high pressure sales tactics involving deliberate lies and misrepresentations to get people to buy more timeshare 'points.'" New York Times, "My Soul Feels Taller: A Whistleblower's $20 Million Vindication," https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-million-vindication.html.  Among the tactics used by one prominent timeshare business: "TAFT" days, where employees were encouraged to "Tell Them Any Frigging Thing" to make a sale, as long as they didn't put it in writing.  Id.

61.     Furthermore, the industry relies on owners' inability to resell their timeshare properties, despite telling prospective buyers that they are purchasing an asset that will only appreciate in value.  Across the industry, timeshare companies refuse to buy back timeshare properties from customers who no longer wish to own them.  As Diamond Resorts, a major industry player, noted in an annual financial filing, if the resale market "were to become more organized and liquid," the resulting availability of vacation units "could adversely affect our sales and our sales prices."  Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," New York Times, January 24, 2016, available at https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.  Not only are some timeshare businesses known for fraudulent

sales tactics, once they convince owners to purchase a property, they trap them in a valueless resale market, leaving them with few options but to continue making their monthly mortgage and maintenance fee payments.

62.    Timeshare businesses also profit from the significant "maintenance fees" they charge each owner.  These fees are supposed to pay for property taxes, landscaping, management, and insurance, and must be paid by the owner even after the full purchase payment is satisfied.  Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/.  To the timeshare industry, these maintenance fees are a profit center, and the leading vacation timeshare trade group celebrates that maintenance fees have increased 4% percent per year on average since 2010.  In 2015, the average timeshare owner paid $920 in maintenance fees per property.  See Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, available at http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard nusbaum.pdf; see also American Resort Development Association, "A Look At Timeshare" Infographic, http://vacationbetter.org/wp-content/uploads/2015/07/aif_15SOI Infographic_7.14.15.jpg.

63.    In recent years, regulators in jurisdictions across the United States have begun enforcing consumer protection laws against the timeshare industry:

   a.    Tennessee Attorney General Herbert H. Slatery III announced a $3 million settlement with timeshare company Festiva due to fraudulent and deceptive tactics that violated the Tennessee Consumer Protection Act, https://www.tn.gov/attorneygeneral/news/pr16-04;

16

b.      Former New York Attorney General Eric Schneiderman halted sales at the Manhattan Club in New York due to allegedly fraudulent sales practices, citing "high-pressure sales tactics" and a "bait-and-switch timeshare scheme," https://ag.ny.gov/press-release/ag-schneiderman-announces-court-order-barring-sales-manhattan-club-timeshare-hotel;

c.      Diamond Resorts International has been sued by owners' groups at multiple resorts, including Diamond Monarch, Hawaii at Poipu, and ILX, alleging fraud and intimidation, Courthouse News Service, "Timeshare Giant Wants Class Action Dumped," January 7, 2016, available at https://www.courthousenews.com/timeshare-giant-wants-class-action-dumped/; Timesharing Today, "Diamond Resorts Hit With Lawsuit by Poipu Point Owners," May/June 2012, available at http://www.tstoday.com/members/magazine/issue123/7-poipu%20point.pdf; and Courthouse News Service, "Couple Claim Timeshare Group Rolled Them," March 12, 2015, available at https://www.courthousenews.com/couple-claim-timeshare-group-rolled-them/.

64.    Federal authorities have begun cracking down on timeshare businesses, including Westgate specifically.  The U.S. Consumer Financial Protection Bureau ("CFPB") has recently investigated Westgate, according to the CFPB's recent decision regarding a civil investigative demand,

to determine whether persons involved in the sale and financing of timeshares have engaged in, or are engaging in, acts or practices in violation of Sections 1031 and 1036 of the [Consumer Financial Protection Act], 12 U.S.C. §§ 5531 and 5536, the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq., the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq., the Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666 et seq., their implementing regulations, or any other Federal consumer financial law.

Decision and Order, In the Matter of Westgate Resorts, Ltd., 2015-MISC-WESTGATE RESORTS, LTD-0001, (U.S. Consumer Financial Protection Bureau March 11, 2016) available at http://files.consumerfinance.gov/f/201603_cfpb_decision-and-order-on-petition-by-westgate-resorts-ltd-to-modify-or-set-aside-civil-investigative-demand.pdf

65.    And the Tennessee Court of Appeals recently affirmed (with modification) a punitive damages award in a case filed by Tennessee timeshare owners against Westgate for defrauding them and hiding required disclosures from them.  See *Overton v. Westgate Resorts, Ltd., L.P.*, No. E2014-00303-COAR3CV, 2015 WL 399218, at *7 (Tenn. Ct. App. Jan. 30, 2015) ("Westgate engaged in intentional and fraudulent conduct and that Westgate willfully violated both the Tennessee Time-share Act and the Tennessee Consumer Protection Act."), appeal denied (June 15, 2015), cert. denied, 136 S. Ct. 486 (2015), available at http://tncourts.gov/sites/defauslt/files/overton.pdf.

## B.    Westgate's Failure to Disclose Material Facts to Timeshare Purchasers

66.    To effectuate its scheme detailed herein, Westgate uses high-pressure sales tactics to induce prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally required information to them.  Among other material omissions, Westgate's scheme includes the following elements:

a.      In Missouri and Tennessee, a timeshare estate is an interest in real property, and a timeshare use is a contractual right of exclusive occupancy. Timeshare sales and closing agents are licensed and /or regulated by the State.  As part of their scheme, Defendants fail to adequately train or to supervise their sales agents, and, in fact, encourage their sales agents to utilize high-pressure sales tactics which violate the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation, the Tennessee Timeshare Act, the Tennessee Real Estate Broker Licensing Act, and the common law.

b.      The Missouri Time-Sharing Regulation, the Tennessee Timeshare Act and the regulations of the Tennessee Real Estate Commissions require timeshare developers and sales agents to deliver various disclosures to timeshare purchasers.  As part of their scheme, Defendants provide their sales and closing agents with a folio to give to purchasers with the purchasers' documentation; however, the folios provided by the Defendants contain a "secret pocket" which Defendants know that their sales and closing agents often use to conceal the required disclosures, including disclosures regarding the purchaser's statutory right to rescind their purchase, in violation of Missouri and Tennessee law, Mo. Ann. Stat. § 407.620 and Tenn. Code. Ann. § 66-32-112(9).

c.      The Missouri Time-Share Regulation, Tennessee Time-Share Act, Tennessee Real Estate Broker Licensing Act contemplate that

purchasers of a timeshare should receive clear and accurate information about their purchase.  As part of their scheme, the Defendants fail to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a "floating use plan"; they fail to adequately disclose how the "floating use plan" actually works; and they fail to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years;

d.      As part of their Scheme, the Defendants fail to disclose to purchasers that because Westgate oversells and artificially restricts the availability of Resort properties (by, for example, renting the properties to non-owners, using the properties as model units, selling to purchasers when no unites are available to be deeded, and closing units for maintenance), they will not be able to use their timeshare purchase as advertised or as would be reasonably expected – or sometimes at all – in violation of the Missouri Time-Sharing Regulation  and the Tennessee Time-Share Act's requirements that timeshare developers must disclose restrictions on use or occupancy, develop and use reasonable arrangements to manage the timeshare program, and avoid making misleading or deceptive representations about it.

67.     Westgate sales agents pressure purchasers to sign a series of complex and misleading legal documents without giving purchasers the opportunity to read—or in some cases, see—the documents they are signing (in some cases electronically).  Only months later, when the new timeshare owners attempt to reserve vacation time in "their" unit, do

they learn that Westgate sold them something entirely different than what Westgate told them they had purchased.

68.    Westgate specifically trains its sales agents to make misrepresentations and omissions during the sales process.  Westgate Resorts Vice President Richard Siegel has been captured on video telling sales agents to "lie" in order to complete a sale:  "You should own at least one week yourselves—and if you don't, lie and say you do!  Don't let these people leave here without buying something! Something!" he said.  "100% of the people we are talking to are—it's not a nice word, but we call 'em mooches. They're coming in for a sales presentation on their vacation for a free gift.  So, we train our sales' people on how to take someone greedy like that and get them to buy today.  We do 100% of our sales on the first day…They will not buy today if they don't get a 'great deal' [making air quotes]—if they don't believe that they're getting a great deal…. Timesharing you sell every unit 52 times because you sell it by the week."[2]

### 1.    Westgate Uses High-Pressure Sales Tactics to Trick Consumers into Making Purchases They Do Not Understand

69.    To effectuate their scheme, Westgate agents approach vacationers on the street, in restaurants, and at other public areas.  They offer them free tickets to local attractions, discounts on timeshare purchases, and vouchers for free meals in order to entice them to take a tour of the Resort.

---

[2] *The Queen of Versailles* (2012), excerpt available at https://www.youtube.com/watch?v= W9G9RD5fnsw.

70.     Once these vacationers arrive at the Resort for the tour, Westgate agents subject them to a high-pressure sales pitch—in some instances lasting as long as eight hours—designed to ensure that they do not leave without purchasing a timeshare property. Westgate agents attempt to persuade prospective purchasers by telling them that a timeshare is cheaper than paying for future vacations, but that they must act immediately in order to take advantage of supposedly discounted prices.

71.     As one of several hundred of online commenters said about the "WESTGATE SCAM":

> The place was beautiful, but they trick you into thinking they are giving you a tour and turned into a 3-hour high-pressure sales pitch in a tent. Finally, we agreed to the lowest deal 3 hours later. We were never getting out of there without agreeing.

> Consumer Affairs, "Westgate Resorts,"

> https://www.consumeraffairs.com/travel/westgate.html

72.     The high-pressure sales tactics do not stop once Westgate completes a sale: existing owners face constant pressure from Westgate agents and employees to upgrade to nicer units.  For example, Westgate assigns owners a "concierge," supposedly to assist them with booking and other transactions, but in fact the concierge is a sales person who pressures owners to "upgrade" their prior purchase—selling back their initial property and purchasing a nicer, larger, or deluxe property.

### 2.     Westgate Fails to Tell Owners that They Cannot Reasonably Use and Enjoy Their Property

73.    Westgate represents to prospective purchasers that as timeshare owners, they will have no difficulty using their timeshare unit whenever they want, provided they book with at least 24 hours' notice.  On its website, Westgate states that owners will enjoy "[a]n easy, flexible floating program where you can choose where, when, and how you want to vacation—the vacation possibilities are endless."

74.    In reality, Westgate fails to disclose that timeshare owners are routinely unable to book units in the Resort with as much as 12 months' notice—the earliest Westgate allows owners to reserve the use of their timeshare.  Timeshare owners have made repeated attempts to book a stay during their allotted time, only to be told by Westgate officials that there is no availability at the Resort.  As a result, many Class Members have been entirely unable to use their timeshare property for an entire year.

75.    Westgate specifically fails to disclose to purchasers that tens of thousands people own timeshare properties at the 1,004-unit Resort, with some owners "owning" multiple "weeks," limiting each owner's ability to use and enjoy the timeshare property for which he or she paid.

76.    Likewise, Westgate fails to disclose to purchasers that it sets aside a substantial number of units in the Resort as vacation rentals, further restricting the supply of units available for timeshare owners to use.  In other words, Westgate chooses to rent units out—including the specific units it lists in deeds of sale to timeshare owners—instead of making them available to owners.  In some instances, as described more fully below, Westgate has told a timeshare owner hat there is no availability in the unit type listed on his or her deed, but the owner then finds the same unit type listed on Westgate's website as a

vacation rental, with proceeds going to Westgate.  Furthermore, Westgate does not inform purchasers that certain purchasers may not receive a deed, for a period of years, but will still be able to make reservations, thereby diluting the availability for existing owners.

77.    Finally, Westgate does not inform purchasers that it sets aside large numbers of demonstration units for the near-constant tours and sales efforts it uses to generate new timeshare business.  Because the profitability of Westgate's timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort.  None of these units are available to the owners who have legitimately paid for the right access to them.

### 3.    <u>Westgate Fails to Adequately Inform Purchasers that They Are Not Purchasing a Share in a Specific Unit</u>

78.    Westgate sales agents give purchasers the impression that they are purchasing the right to use a specific unit at the Resort.  In actuality, they are participating in Westgate's "Floating Use Plan," which gives owners the right to use a certain type of unit, subject to availability.  And units are rarely, if ever, available to "owners," as advertised or expected.

79.    The purchase documents Westgate drafts and requires purchasers to sign lead them to believe that they are purchasing a share in a specific unit in the property.  For example, the Warranty Deeds drafted by Westgate and signed by Plaintiffs state that they have the "right to occupy, pursuant to the Plan," specific units at the Resort.  However, in

the fine print of Westgate's Floating Use Plan, purchasers relinquish their rights to possess and use specific units at the Resort. Westgate sales agents do not disclose this to purchasers during the high-pressure sales process.

80.    Westgate does not even give owners the right to use similar units at the Resort. Despite making repeated representations in the high-pressure sales pitches that owners can book their specific unit, or an identical one, for use anytime in the time period purchased, Westgate routinely prevents owners from booking the unit type. In this way, Westgate's "floating use" plan, which it does not adequately describe to timeshare purchasers, fails to provide purchasers reasonable access to their timeshares.

### 4.    Westgate Uses a "Secret Pocket" to Conceal Legally Required Disclosures from Purchasers

81.    To protect consumers from abusive practices like those employed by Westgate, Tennessee law requires a timeshare developer to make certain disclosures to purchasers, including informing them of their right to rescind the contract after leaving the high-pressure sales pitch. Westgate routinely uses a folio containing a secret pocket that enables its commission-based closing offers to conceal the disclosures so consumers will not find them and try to rescind their purchase.

82.    Specifically, the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, requires the timeshare developer prior to the execution of any contract between the purchaser and the timeshare developer, to deliver to the purchaser certain information, and

the purchaser shall certify, in writing, to the receipt of such written information. As relevant to this lawsuit, the required information includes:

a.    A complete and accurate description of all limitations, restrictions, or priorities employed in the operation of the exchange program, including, but not limited to, limitations on exchanges based on seasonality, unit size, or levels of occupancy, expressed in boldfaced type, and, in the event that such limitations, restrictions, or priorities are not uniformly applied by the exchange program, a clear description of the manner in which they are applied;

b.    The number of units in each property participating in the exchange program which are available for occupancy and which qualify for participation in the exchange program, expressed within the following numerical groupings: 1-5, 6-10, 11-20, 21-50, and 51 and over; and

c.    The number of owners with respect to each time-share plan or other property which are eligible to participate in the exchange program expressed within the following numerical groupings: 1-100, 101-249, 250-499, 500-999, and 1,000 and over; and a statement of the criteria used to determine those owners who are currently eligible to participate in the exchange program;

d.    Mo. Ann. Stat. § 407.625. Violation of any of these provisions is a class A misdemeanor. Mo. Ann. Stat. § 407.630.

83.     Similarly, the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., requires a timeshare developer to provide each purchaser a Public Offering Statement. The Public Offering Statement must "fully and accurately disclose" to the purchaser that he or she has the right to rescind the contract within a designated amount of time.  Specifically, it must include:

    a.     A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

    b.     Tenn. Code. Ann. § 66-32-112(9).  A timeshare purchase contract is voidable until the purchaser has received the Public Offering Statement. Tenn. Code Ann §66-32-114.  Corresponding state regulations require that this same rescission language be found on the purchase contract.

84.     It is Westgate's standard practice to give each new purchaser who buys a vacation timeshare at the Resort a black folio.  Generally made of black faux leather, the folio zips shut and has numerous readily visible pockets on the outside and on the inside. There is room for documents to simply be placed inside without being in any pocket, since the entire folio zips shut.  The black folio contains Westgate's name and logo on the inside.

85.    Notwithstanding Westgate's duty to provide each purchaser a Public Offering Statement and purchase contract disclosing the purchaser's right to rescind, Westgate provides its commission-based closing agents with the folio containing the secret pocket, knowing that those closing agents often withhold and conceal this information from purchasers by hiding it in the secret pocket.  The secret pocket is not readily ascertainable to a reasonable person.

86.    Westgate's commission-based sales representatives routinely do not inform purchasers, including at various times Class Members, that the Public Offering Statement and purchase contract are concealed within the secret pocket.  Therefore, while purchasers have technically been given the Public Offering Statement and purchase contract, they do not know they have it and are not told about their right to rescind.  In this way, Westgate's concealment prevents purchasers from exercising their right to rescind the contract.  See generally Paul Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), available at

https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html.

**5.    Because the Resort is Oversold, Westgate Fails to Deliver Deeds to Owners**

87.    Westgate routinely fails to deliver warranty deeds to owners because it sells more timeshare properties than the fractional interests it possesses, leaving it without sufficient deeds to provide owners.

88.    When purchasers buy a timeshare property at the Resort, the warranty deed should be recorded by Westgate with the Sevier County Register of Deeds.  Recording the warranty deed protects purchasers from title claims by third parties, and conversely, the failure to properly record the warranty deed leaves purchasers vulnerable to such claims.

89.    Purchasers of timeshare properties at the Resort are told that Westgate will record their Warranty Deed and send them a copy.  Westgate agents do not tell purchasers that buried in fine print, Westgate asserts that it can delay assigning a unit and recording the deed for up to three years.  Nor does Westgate tell purchasers that in some cases, it has not recorded their deed.  As a result, purchasers reasonably believe that their property transaction will be duly recorded, and their real property interest is protected from claims by third parties.

90.    Westgate's routine failure to record warranty deeds further evidences Westgate's pattern and practice of overselling the Resort: it cannot record and deliver deeds because it sells more fractional interests in real property than actually exist.  Westgate's attempt to remedy this failure with hidden contract language only demonstrates that Westgate is in the business of defrauding its customers.

**C.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Jeffrey Kellough and Emily Kellough**

91.    Plaintiffs Jeffrey Kellough and Emily Kellough are Westgate owners who went to Gatlinburg, Tennessee on their honeymoon in 2015.

92.    While walking down the main strip, they were approached by Westgate agents and were given "free" tickets to various events in exchange for their "voluntary" attendance at a Westgate timeshare presentation.

93.    They checked in at 10:00 a.m. at the front of the Smoky Mountain Resort along with other couples to wait to hear the presentation. They subsequently went on a tour of the resort and Westgate agents explained how great the resort was and how the couples would reap the many benefits resort ownership included.

94.    After the tour, the Kelloughs were escorted to an auditorium with the other couples and spoke with three Westgate agent salespeople about purchasing a time share.

95.    The Kelloughs explained that they could not afford to purchase the resort, however, the agents told the Kelloughs would have to wait and speak with the manager before they could leave.

96.    Sometime later, the manager arrived and came out and found a way for them to afford the purchase.

97.    The manager stated they could get around the normal lending criteria by selling them a foreclosed property, and they only need to pay the amount that was still owed and that this was a steal for the property.

98.    They terms the Westgate manager promised was that the Kelloughs would only pay every two years plus the maintenance and, since they were low on funds, Westgate would allow them to pay the down payment in three payments over three months.

99.    The Westgate manager assured the Kelloughs the timeshare property they were buying would increase in value and they could later sell it back to Westgate for a profit.

100.    For their free gift, the Kelloughs were also given tickets to two shows (a murder mystery dinner and a magic show), but only if they put down $150 that day before they left.

101.    The Kelloughs were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out. Unlike they were promised, they were never given any tax information.

102.    They presentation the Kelloughs attended lasted from 10:00 a.m. until dark. They were not offered any food during their time at the presentation, but they were given a breakfast voucher to use the next morning.

103.    Immediately after they left the presentation, Emily looked at Jeffrey and said, "What did we just do?" The Kelloughs felt lied to and misled.

104.    The Kelloughs have never been able to use the property they thought they were purchasing. They were given a voucher that they were told could be used for a "free" week in Orlando, Florida, or a "free" cruise. They were given a phone number to make the reservation, but when they called, they learned but only half of the stay was paid for and they had to pay the rest themselves.

105.    They the attempted to make reservations at the suggested alternate resort, Allegiant, but again nothing was available, so they ended up going to Coco Beach. They

arrived there to find a small apartment and Emily immediately killed a large black bug. Disgusted, they left and ended up staying somewhere else for the remainder of the trip at their own expense.

106.    In response to their complaints regarding their treatment, the Kelloughs were offered an upgrade to their status, but only if they paid additional money to join Interval International and join a points program that was never explained to them. They refused.

**D.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Wendell Bowsher and Barbara Bowsher**

107.    Plaintiffs Wendell Bowsher and Barbara Bowsher are owners at the Smoky Mountains Resort, which they purchased in 2003.

108.    Plaintiffs were convinced to purchase an upgrade to their ownership on October 31st, 2018. Specifically, they believed they were buying a 6-room cabin. Unbeknownst to them, the Westgate agents actually sold them three separate contracts for three timeshares with two bedrooms each.

109.    The Bowshers were misled by the sales agents because Westgate agents told them that they were purchasing real property that could be sold later.

110.    The Bowshers have had great trouble making reservations at the Resort and have found the reservation process to be very confusing and inconsistent.  Excuses for unavailability have included that on November 29, 2016, and again on March 14th, 2018, Smoky Mountain Resort had purportedly been involved in a wildfire that destroyed some of the Resort's buildings.

111.     Additionally, every time the Bowshers have been able to reserve and utilize their timeshare, Westgate agents have told them that they were required to go to an owner update meeting. The Westgate agents explained that they had to attend the owners update meeting because, as an owner, it was their duty to be informed about the latest changes. However, all of the owners meeting they have attended have turned out to be another sales presentation. Since they first bought the timeshare in 2003, Plaintiffs have been pressured into upgrade their timeshare at each of these "owner update meetings."

112.     On one occasion in 2016, the Bowshers arrived at the Smoky Mountain Resort during a personnel strike and had to wait four hours to be able to get into their room. Once inside, they found the room dirty, there was no housekeeping service available, and had to clean the room themselves.

113.     On another occasion, the Bowshers arrived at the resort on the date they reserved and were told by the Westgate agent concierge that all rooms were booked and therefore the Bowshers would not be able to utilize their assigned rooms.

114.     At the owner's meeting on March 14th, 2018, the Bowshers were told by a Westgate agent that ownership provided exclusive access to the resort and they would be saving money because owning a timeshare is much cheaper than going on vacation.  The Westgate agent also promised them that because the maintenance fees do not increase, therefore the price of vacationing would always remain the same and they would always have a prepaid place to stay that is also affordable and cheaper even "than going to a motel." However, the Bowshers later learned, contrary to the Westgate agent's representations, that non-timeshare-owners could also book rooms at Smoky Mountain resort and spa and that actually maintenance fees do increase yearly. In fact, the maintenance fees increased

33

annually from $400.00 to $1,500.00 per year. Further, after the wildfires, the Bowshers were required to pay special assessments which were never discussed as a possibility before.

115.    Also, at the owners meeting on March 14th, 2018, the Bowshers were promised by Westgate agents that the property they owned through Westgate would increase in value over time. The Bowshers were also told they would be able to sell the timeshare for a higher price than what they bought it. They were also told that would be able to rent their timeshare for a profit. When the Westgate agent saw that this interested the Bowshers, he assured the client that they most certainly would make a profit though renting, that would be more than enough to pay for both their maintenance fees and mortgage payments. The Westgate agent promised the Bowshers that Westgate has a special department ready to help them rent their timeshare. The Westgate agent assured them that the process of renting was a very simple procedure. However, Plaintiffs later found out that Westgate will not help them rent their timeshare, quite the opposite, plaintiffs had to do all the work themselves and the procedure is far from simple, rendering them to give up on trying to rent their timeshare.

116.    At another owner's update meeting in October 31st, 2018, the Westgate agent pressured and coerced the Bowshers into upgrading right away because their building had burned down in the wildfires and they would not be able to use it until Westgate rebuilds again. Plaintiffs felt that the only way out of the owners meeting and to save their investment was by signing the upgrade. The Bowshers did not want to upgrade, but the Westgate agent would not let them leave. The Bowshers complained that the agent was ruining their vacation, but this just result in the Westgate agent becoming rude and applying more pressure.

117. The Bowshers have consistently found customer service at Smoky Mountain Resort to be very poor. In October of 2019, the Westgate agent acting as concierge had greeted them very rudely and refused to help them settle into their room. Although the Bowshers are elderly, the Westgate agent stated they must carry their belonging to their room themselves. Upon arriving at the room, the Bowshers discovered they had been assigned a different room than the one they believed they "owned." The room they were assigned to was one of noticeably lesser quality. When they complained, the Westgate agent informed them that their room and all others were booked. The Bowshers felt lied to because the Westgate agent they had purchased the ownership from told them they had the right to use the timeshare they paid for every year and that they would always be assigned to their purchased unit.

118. The Bowshers were also promised by Westgate agents at their purchase that they would have parking space assigned to them. Instead, upon their arrival, they found out that anyone can use any parking space and were forced to park outside the resort perimeters because there was no parking space available. Alarmingly, when the Bowshers questioned some of the car owners who was parking in the spot they were supposedly assigned, they found out these people included the Westgate director, the director of operations and the client services director. The Westgate Smokey Mountain director admitted to the Bowshers that he had a parking space assigned to him in another area, but preferred using the parking space assigned to the Bowshers because it was a shorter walk and the resort had parking space problems.

**E.** **Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Brian Hearn and Kathleen Hearn**

119.    Brian Hearn and Kathleen Hearn purchased their ownership at Smoky Mountain Resort in 1995, while visiting Orlando, Florida. In in 2002, they convinced by Westgate agents to upgrade and their ownership. Their most recent upgrade was in August 2018, again because of the aforementioned fire at the property.

120.    The Hearns were misled by the sales agents when they upgraded in 2002, because Westgate agents told them that they were purchasing real property that could be sold later. The Hearns later learned this was untrue. The Hearns were also told that they could rent out the property, but when they attempted to do so, they were informed by a Westgate agent that Westgate does not allow renting. Further, when they purchased, Westgate agents assured the Hearns that the maintenance fees would not increase but, instead, they have increased every year. The Hearns have never been able to stay at their first choice of property when they call to make a reservation. While Westgate agents represented to the Hearns that they were purchasing less expensive vacation prices, the Hearns have found that it is actually cheaper to book stays at Smoky Mountain Resort from other online booking websites.

**F.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Shirley Acree and James Acree**

121.    Shirley Acree and James Acree purchased ownership at Westgate Las Vegas Resort in August 2018, while on vacation in Kissimmee, Florida through Westgate Las Vegas Resort.

122.    The Acrees feel misled and lied to. Specifically, the Acrees were told by Westgate agents that they were purchasing real property that could be sold later at a higher price, which they later found to be untrue. The Acrees were told by Westgate agents that they could rent out the property, but later learned from a Westgate agent that Westgate does not allow renting. The

Acrees were never shown what the maintenance fees would be and the Westgate agents they purchased from promised that the maintenance fees they were charged would never increase. Instead, the Acrees discovered that the maintenance fees have increased each year.

123.    Additionally, The Acrees have never been able to stay at their deeded property when they have attempted to call to make a reservation for their week. While Westgate agents represented to the Acrees that they were purchasing less expensive vacation prices, the Acrees have found that it is actually cheaper to book stays at the Las Vegas Resort from other online booking websites.

124.    The Acrees reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

### G.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Rita Baker

125.    Plaintiff Rita Baker purchased her timeshare ownership from a Westgate agent while in Orlando, Florida. While Baker was not initially interested in purchasing a timeshare because of the price, The Westgate agent convinced her she could by a cheaper one in Arizona. Baker told the Westgate agent would never use the timeshare because it was located in Arizona, but the Westgate agent assured her she could easily vacation anywhere in the world though the RCI or Interval International exchange program. The Westgate agent never disclosed to Baker that she would have to pay an additional membership fee to take advantage of the exchange programs.

126.    Ms. Rita Baker reasonably believed the deed that was recorded was evidence that she had purchased an interest in real property.

### H.     Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Cassandra Butler

127.     Cassandra Butler purchased her ownership over 10 years ago and upgraded in 2016 from Orlando Resort to Myrtle Beach Resort in South Carolina, because a Westgate agent deceptively informed her that something was purportedly "wrong" with her contract when she attended a mandatory owner's meeting.  In 2019, Cassandra hired an attorney regarding the matter, who told her that there was actually nothing wrong with the earlier contract and she was now in an even more onerous, but binding contract which she could not now terminate.

128.     Butler feels misled and lied to because the Westgate agent refused to explain precisely what was wrong with her current timeshare contract and, instead, coerced her into upgrading. Baker believed she could not leave the mandatory owner's meeting without signing up to buy the bigger room. The Westgate representative refused to give her the opportunity to consult with her attorney. Since the upgrade, Baker has not been able to make a reservation or use the timeshare. Contrary to the representations of the Westgate agent, Baker's maintenance fees have quadrupled since the upgrade.

129.     Butler was misled by the sales agent when she upgraded in 2016, because Westgate agents told them that they were purchasing real property that could be sold later.

130.     Butler was not given any information about recission, exiting the timeshare, or that there was a statutorily required grace period for getting out.

I.    **Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Ulysee Taylor and Lemoria Taylor**

131.    Plaintiffs Ulysee Taylor and Lemoria Taylor purchased their Westgate timeshare ownership in 2017 in Kissimmee, Florida.

132.    While on one trip, the Taylors were told they must attend a mandatory owners meeting. While at the owner meeting, the Taylors were tag-teamed by several Westgate agents with increasing pressure for them to make an upgrade purchase. The Westgate agents told the Taylors timeshare ownership was an investment and they could make money renting the property. When the Taylors continued to say, "No," the Westgate agents began getting visibly angry and raising their voices. The Taylors finally caved in and made the purchase.

133.    Subsequently, the Taylors found the Westgate agents representations were untrue. They would have to pay Westgate to rent the property out to anyone else. Contrary to the Westgate agents' assertions, their family could only use the property for an additional fee and the maintenance fees increased. Plaintiffs feel misled by Westgate because they were pressured to make a purchase that was supposedly a special deal and purportedly only available that day. Even though they had supposedly purchased an upgraded status making reservations easier, when they have tried to make reservations, the dates have not been available.

134.    The Taylors were misled by the sales agents because Westgate agents told them that they were purchasing real property that could be sold later.

135.    The Taylors were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

**J.      Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Dana Coffman**

136.    Dana Coffman and his wife bought their timeshare ownership over 25 years ago. The property changed developers' numerous times and was eventually acquired by Westgate.

137.    Mr. Coffman was misled by the sales agents because Westgate agents told him that he was purchasing real property that could be sold later.

138.    In 2017, Westgate agents convinced Coffman to upgrade to a Branson, Missouri, property. In 2018 the client took a vacation at Branson Woods Resort and was told he must go to a mandatory owners meeting taking place at Branson Lakes Resort. Coffman was taken on a tour. The Westgate agent told Coffman that for purchasing a higher status, they would be able to use the Interval International exchange program and would have exclusive access to newly built rooms. Additionally, the Westgate agent stated they would soon have access to a nearly completed water park. However, after they purchased, when Coffman attempted to make the reservations, a Westgate agent told him it was not possible to stay in those rooms because of the type of contract he has.  To date, the water park has not been completed and Coffman's wife has passed away.

**K.      Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs James and Marieth Mitchell**

139.    James and Marieth Mitchell bought their timeshare ownership many years ago.

140.    Westgate agents told the Mitchells the timeshare was an investment and would increase in value over time and that they could later sell the timeshare at higher price than they paid for it for. The Westgate agents also told the Mitchells they could rent the timeshare out for a profit and that maintenance fees would never increase slightly. Westgate agents told the Mitchells there would never be any special fees, that they would always get to stay at their first choice of property and that making reservations would never be a problem.

141.    The Mitchells felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Mitchells that their purchase was a special deal that was only available that day. The Mitchells were never told about their statutory right to recission.

142.    The Mitchells later learned all of the foregoing representation made by the Westgate agents were false. The Mitchells believed they were lied to and misled. They were never able to rent out their property and later learned the Westgate department supposedly assigned to assist them in renting the unit out never existed. Westgate agents at the purchase told them they could refinance the timeshare at a lower rate later, but they later learned that banks will not refinance timeshares. Agents at the Westgate resort later told them that they are not responsible for what the Mitchells were told in the sales presentation. Maintenance fees increased substantially and were due each year even though Westgate agents at the sale told them they only had to pay every other year. When the Mitchells attempted to sell their

41

unit back, they were informed by that Westgate does not accept back timeshares they sell and that they are not allowed to terminate or sell their interest.  The Mitchells have never been able to stay at the property they purchased because it is always full. Making reservations is difficult every time with many issues that arise each time.

**L.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Donald Kolander**

143.    Donald Kolander bought his timeshare ownership in 2007 at the Smoky Mountain Resort.

144.    Westgate agents told Kolander the timeshare was an investment and would increase in value over time and that he could later sell the timeshare at higher price than he paid for it for. The Westgate agents also told Kolander he could rent the timeshare out for a profit. Westgate agents told Kolander his family members and friends could use the timeshare for free during his week and that maintenance fees were fixed and would never increase. Westgate agents told Kolander that he would always get to stay at his first choice of property, that making reservations would never be a problem, and he could travel to any part of the world.

145.    Kolander felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told Kolander that his purchase was a special deal that was only available that day.

146.    Kolander was misled by the sales agents because Westgate agents told him that he was purchasing real property that could be sold later.

147.    Kolander later learned all of the foregoing representation made by the Westgate agents were false.

**M.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Kenner and Dorisona Nadermann**

148.    Kenner and Dorisona Nadermann bought their Westgate timeshare ownership seven years ago.

149.    Westgate agents told the Nadermans the timeshare was an investment and would increase in value over time and that they could later sell the timeshare at higher price than they paid for it for. The Westgate agents also told the Nadermans they could rent the timeshare out for a profit and that maintenance fees would only increase slightly, if at all. Westgate agents told the Nadermans there would never be any special fees, that they would always get to stay at their first choice of property and that making reservations would never be a problem.

150.    The Nadermans felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Nadermans that their purchase was a special deal that was only available that day.

151.    The Nadermans later learned all of the foregoing representation made by the Westgate agents were false. The value of the property did not increase, but instead they were forced to upgrade to maintain their level of reservations because their ownership had devalued. They were never able to rent out their property and the Westgate agent who was supposedly assigned to assist them in renting the unit out would never return their calls.

Maintenance fees increased substantially each year. The Nadermans were charged special assessments of thousands of dollars to the Smokey Mountain fire. The Nadermans have never been able to stay at the property they purchased because it is always full. Making reservations is difficult every time with many issues that arise each time.

152.    The Nadermans reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

**N.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Charles Richardson**

153.    Charles Richardson bought his Westgate timeshare ownership twenty years ago and has been convinced by Westgate agents to purchase upgrades several times since then at "mandatory" owners' meetings.

154.    Westgate agents told Richardson the timeshare was an investment and would increase in value over time and that he could later sell the timeshare at higher price than he paid for it for. The Westgate agents also told Richardson he could rent the timeshare out for a profit and that a Westgate agent would help him do so. Westgate agents told Richardson his maintenance fees would never increase. Westgate agents told Richardson that he would always get to stay at his first choice of property, that making reservations would never be a problem, and he could travel to any part of the world.

155.    Richardson felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told Richardson that his purchase was a special deal that was only available that day. Richardson was not told about his statutory right to recission.

156.     Richardson later learned all the foregoing representation made by the Westgate agents were false. Richardson feels lied to and misled because, in addition to the foregoing, he was shown a luxury suite  which was represented by Westgate agents as what he was upgrading to, but that later learned was not available at his level of ownership.

157.     Richardson was misled by the sales agents because Westgate agents told him that he was purchasing an interest in real property.

**O.     Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Irving Cummings and Grace Cummings**

158.     Irving Cummings and Grace Cummings bought their Westgate timeshare ownership in Kissimmee, Florida in 2002, and were convinced by Westgate agents to upgrade on April 10, 2013.

159.     Westgate agents told the Cummings they could rent the timeshare out for a profit and that maintenance fees would only increase slightly, if at all. Westgate agents told the Cummings that ownership was much cheaper than taking an independent vacation to the resort.

160.     The Cummings felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Cummings that their purchase was a special deal that was only available that day.

161.     The Cummings were misled by the sales agents because Westgate agents told them that they were purchasing real property that could be sold later.

162.    The Cummings later learned all the foregoing representation made by the Westgate agents were false. They were never able to rent out their property and no Westgate agent was available to assist them. When they attempted to allow their son to use their unit, they were charges an extra $100. Maintenance fees increased substantially each year, eventually doubling. The Cummings have learned it is actually cheaper to book stays at the resort from other online booking websites. In April 2019, when the Cummings have attempted to stay at their property, they were told it was not available.

P.    **Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Bonnie Jernigan**

163.    Bonnie Jernigan bought her Westgate timeshare ownership at Smoky Mountain Resort in 2016 and was convinced by Westgate agents to upgrade at Branson Resort in 2017.

164.    Westgate agents told Jernigan the timeshare was an investment and would increase in value over time and that she could later sell the timeshare at higher price than she paid for it for. The Westgate agents also told Jernigan she could rent the timeshare out for a profit. Westgate agents told Jernigan her family could also use the timeshare. Westgate agents told Jernigan that she would always get to stay at her first choice of property, that making reservations would never be a problem, and she could travel to any part of the world.

165.    Jernigan felt pressured to take the deal in a presentation that lasted several hours and she was confronted by three different Westgate agents. Westgate agents told

46

Jernigan that her purchase was a special deal that was only available that day. Jernigan was not told about her statutory right to recission.

166.    Jernigan was misled by the sales agents because Westgate agents told her that she was purchasing real property that could be sold later.

167.    Jernigan later learned all the foregoing representation made by the Westgate agents were false. Jernigan was lied to and misled because, in addition to the foregoing, she was shown a luxury suite  which was represented by Westgate agents as what she was upgrading to, but that later learned was not available at her level of ownership.

168.    Jernigan was not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

## Q.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Charles Orr and Reba Orr

169.    Charles and Reba Orr bought their Westgate timeshare ownership in 2000.

170.    A Westgate agent told the Orrs the timeshare was an investment and would increase in value over time and that they could later sell the timeshare at a higher price than they paid for it for. A Westgate agent also told the Orrs they could rent the timeshare out for a profit. Westgate agents told the Orrs that they would always get to stay at their first choice of property and that making reservations would never be a problem.

171.     The Orrs felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Orrs that their purchase was a special deal that was only available that day. The Orrs were not told about the statutory recission period.

172.     The Orrs later learned all of the foregoing representation made by the Westgate agents were false. The value of the property did not increase, and they were never able to rent out their property. The Orrs have not always been able to stay at the property they believed they purchased and making reservations is difficult.

**R.     Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff John Wright**

173.     John Wright bought his Westgate timeshare ownership in 2013.

174.     Westgate agents told Wright he was purchasing real property with a deed, that the timeshare was an investment and would increase in value over time and that he could later sell the timeshare at higher price than he paid for it for. The Westgate agents also told Richardson he could rent the timeshare out for a profit and that a Westgate agent would help him do so. Westgate agents told Wright his maintenance fees would never increase, would only be once every two years, and that purchasing a timeshare is cheaper that paying for future vacations. Westgate agents told Wright that he would always get to stay at his first choice of property, that making reservations would never be a problem, and he could travel to any part of the world.

175.    Wright felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told Wright that his purchase was a special deal that was only available that day. Wright was not told about his statutory right to recission.

176.    Wright later learned all the foregoing representation made by the Westgate agents were false. Wright feels lied to and misled because he has never been able to rent out his property and no Westgate agent has been available to assist them. Wright's maintenance fees were changed to yearly, eventually doubling. Wright has learned it is actually cheaper to book stays at the resort from other online booking websites. Making reservations has been consistently difficult for Wright.

**S.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Clifford Koleski and Donna Koleski**

177.    Plaintiffs Clifford Koleski and Donna Koleski bought their Westgate timeshare ownership in Orlando, Florida in 2015.

178.    Westgate agents told the Koleskis they were buying a piece of real property, that the timeshare was an investment and would increase in value over time, and that they could later sell the timeshare back to the resort at higher price than they paid it for. The Westgate agents also told the Koleskis they could rent the timeshare out for a profit and that maintenance fees would never increase. Westgate agents told the Koleskis they would always get to stay at their first choice of property and that making reservations would never be a problem.

179.    The Koleskis felt pressured to take the deal in a presentation that lasted several hours. They were confronted by the Westgate agents, one of whom said he was in the military. Westgate agents told the Koleskis that their purchase was a special deal that was only available that day. The Koleskis were never told about the statutory recission period.

180.    The Koleskis later learned all of the foregoing representation made by the Westgate agents were false. The Koleskis were lied to and misled by the Westgate agents. They were never able to rent out their property and they were never given promised assistance by Westgate agents. They never received the free Universal Studios vacation package Westgate agents promised them. Maintenance fees increased substantially each year. When they tried to sell the timeshare back, Westgate agents told them the resort was not interested. Making reservations is difficult every time. In addition to the foregoing, the luxury suite the Koleskis where shown before they purchased later learned was not available at their level of ownership.

**T.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Paige Smith**

181.    Paige Smith bought her Westgate timeshare ownership in Orlando, Florida 2019.

182.    Westgate agents told Smith she was purchasing real property, that the timeshare was an investment and would increase in value over time and that she could later sell the timeshare at higher price than she paid for it for. The Westgate agents also told Smith she could rent the timeshare out for a profit. Westgate agents told Smith her family

could also use the timeshare. Westgate agents told Smith that she would always get to stay at her first choice of property, that making reservations would never be a problem, and she could travel to any part of the world.

183.    Smith felt pressured to take the deal in a presentation that lasted several hours and she was confronted by three different Westgate agents. Westgate agents told Smith that her purchase was a special deal that was only available that day. Jernigan was not told about his statutory right to recission.

184.    Smith later learned all the foregoing representations made by the Westgate agents were false. Smith was lied to and misled because she was not told maintenance fees would increase, and that she would be charged an additional fee for her family to use her resort dates.

U.    **Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff Walter Washington**

185.    Washington bought his Westgate timeshare years ago and was convinced by Westgate agents to purchase an upgrade on May 2, 2019 in Las Vegas, Nevada.

186.    Westgate agents told Washington he was personally purchasing real property that he would own, that the timeshare was an investment and would increase in value over time and that he could later sell the timeshare at higher price than he paid for it for. The Westgate agents also told Washington he could rent the timeshare out for a profit and that a Westgate agent would help him do so. Westgate agents told Washington that his maintenance fees would never increase. Westgate agents told Washington that he would

always get to stay at his first choice of property, that making reservations would never be a problem, and he could travel to any part of the world.

187.    Washington felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told Washington that his purchase was a special deal that was only available that day. Washington was told about his statutory right to recission, but Westgate agents refused to tell him how to execute the cancellation.

188.    Washington later learned all the foregoing representation made by the Westgate agents were false. Washington feels lied to and misled because, in addition to the foregoing, he was given a coupon for a free vacation which he learned later he was not allowed to use because he was not married. Contrary to Westgate agents' earlier assertions, Washington also learned that it is actually cheaper to book stays at the Resort from other online booking websites.

## V.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Veronica and William Mauck

189.    Plaintiffs Veronica and William Mauck bought their Westgate timeshare in Las Vegas years ago and upgraded to Orlando in 2015.

190.    Westgate agents told the Maucks they were buying real property, the timeshare was an investment and would increase in value over time and that they could later sell the timeshare back to the resort at higher price than they paid for it for. The Westgate agents also told the Maucks that maintenance fees would not increase, that they would

always get to stay at their first choice of property and that making reservations would never be a problem.

191.    Maucks felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Maucks that their purchase was a special deal that was only available that day.

192.    The Maucks later learned all of the foregoing representation made by the Westgate agents were false. Maintenance fees increased substantially each year and Westgate agents told the Maucks they could not sell their property back to Westgate.

193.    The Maucks reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

194.    The Maucks were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

**W.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiff John Thomas, Sr.**

195.    John Thomas, Sr. bought his Westgate timeshare ownership in 2017 in Las Vegas, Nevada, and was convinced by Westgate agents to upgrade in 2018 at Myrtle Beach, South Carolina.

196.    Westgate agents told Thomas the timeshare was an investment and would likely increase in value over time and that he could later sell the timeshare at higher price than he paid for it for. The Westgate agents also told Thomas he could rent the timeshare out

for a profit and that a Westgate agent would help him do so. Westgate agents told Thomas his maintenance fees would never increase. Westgate agents told Thomas that he would always get to stay at his first choice of property, that making reservations would never be a problem, and he could travel to any part of the world.

197.    Thomas felt pressured to take the deal in a presentation that lasted several hours. Thomas was confronted by three Westgate agents who told him that his purchase was a special deal that was only available that day. Thomas was not told about his statutory right to recission.

198.    Thomas reasonably believed the deed that was recorded was evidence that he had purchased an interest in real property.

199.    Thomas later learned all the foregoing representation made by the Westgate agents were false. Thomas feels lied to and misled because, in addition to the foregoing, he has never been able to make a reservation, his maintenance fees went from every other year to yearly without notice, and Thomas was shown a luxury suite  which was represented by Westgate agents as what he was upgrading to, but that later learned was not available at his level of ownership. Contrary to Westgate agents' earlier assertions, Thomas later learned that it is actually cheaper to book stays at the Resort from other online booking websites.

## X.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Thomas and Jacquie Haynes

200.    Plaintiffs Thomas and Jacquie Haynes purchased their timeshare ownership years ago in Kissimmee, Florida, and were convince by Westgate agents to upgrade in July 2019.

201.    While attending an owner's meeting because they were convinced that they could pay it off as well. Plaintiffs were convinced by the salespeople that it was a good idea to upgrade to a newer building.

202.    The Haynes reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

203.    The Haynes were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

Y.    **Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Jeffrey Gay and Karen Gay**

204.    Plaintiffs Jeffrey Gay and Karen Gay bought their Westgate timeshare years ago in Orlando, Florida and were convinced by Westgate agents to upgrade in 2009.

205.    Westgate told the Gays they could rent the timeshare out for a profit and Westgate even offered to help.  Westgate agents told the Gays that ownership was much cheaper than taking an independent vacation to the resort.

206.    The Gays felt pressured to take the deal in a presentation that several hours. Westgate agents told the Gays that their purchase was a special deal that was only available that day.

207.    The Gays reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

208.    The Gays later learned all the foregoing representations made by the Westgate agents were false.  They were never able to rent out their property and when trying to make reservations, Westgate agents were never available to assist them.  Maintenance fees increased substantially each year, eventually doubling.

209.    The Gays were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

**Z.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Raymond Dage**

210.    Plaintiff Raymond Dage bought his Westgate timeshare ownership in Florida originally in 1992 and was convinced by Westgate agents to upgrade his and transfer his ownership to the Westgate Branson Lakes Resort.

211.    Westgate agents told Dage he could rent the timeshare out for profit, however when he attempted to do so, Westgate agents would never return his calls.  Dage felt pressured by Westgate agents to take the deal in a presentation that lasted almost four hours.

212.    Dage later learned that all the representations the Westgate agents made were false.  Dage was never able to get a better room unless he upgraded rooms every year. Additionally, Dage was charged Special Assessments for remodeling units they didn't even own. Dage was misled by the sales agents because Westgate agents told him that he was purchasing real property that could be sold later.

213.    While Dage was told about the statutory recission period, Westgate agents refused to tell him how to execute the same.

**AA.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Stanley Comer and Patricia Comer**

214.    Plaintiffs Stanley Comer and Patricia Comer Westgate timeshare June 2019.

215.    Westgate agents told the Comers they could rent the timeshare out for a profit and that the maintenance fees would only increase slightly.  Westgate agents told the Comers that ownership was much cheaper than taking an independent vacation to the resort.

216.    The Comers felt pressured to take the deal in a presentation that lasted several hours.  Westgate agents told the Comers that their purchase was a special deal that was only available that day.

217.    The Comers later learned all the foregoing representation made by the Westgate agents were false.  They were never able to rent out their property and no Westgate agent was available to assist them.  The Comers were misled by the sales agents because Westgate agents told them that they were purchasing real property that could be sold later.

218.    The Comers were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

**BB.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Troy Thompson and Martha Thompson**

219.    Plaintiffs Troy Thompson and Martha Thompson upgraded their Westgate timeshare in 2015.

220.    The Thompsons reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

221.    Westgate agents told the Thompsons they could rent out the timeshare to others for profit, their maintenance fees would never increase, and that the timeshare was an investment that would increase in value over time.

222.    The Thompsons felt pressured to take the deal in a presentation that lasted several hours. They were confronted by three Westgate agents who told him that his purchase was a special deal that was only available that day. The Thompsons were told about their right to recission, but Westgate agents refused to explain how they could execute the same.

223.    The Thompsons later learned all the foregoing representation made by the Westgate agents were false.

**CC.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Mac Williams and Colleen Williams**

224.    Plaintiffs Mac Williams and Colleen Williams bought their Westgate timeshare ownership in Orlando Florida in 1999-2001.

225.    The Williams reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

226.    Westgate agents forced the Williams to purchase Westgate, then Kissimmee, then Paris, a sales agent, told them that they could save on maintenance fees by going with Las Vegas.  Westgate sales agent Paris told Williams that he hated Vegas for various reasons.

227.    The Williams felt pressured to take the deal in a presentation that lasted four hours.  Westgate agents told Williams that they had a legal right to rescind or cancel their purchase within three days but refused to explain how to execute the same.

228.    The Williams later learned all the foregoing representation made by the Westgate agents were false.  They were never able to rent out their property.

**DD.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Rodney Meyer and Katharine Meyer**

229.    Plaintiffs Rodney Meyer and Katharine Meyer upgraded their Westgate time share in 2018.

230.    Westgate agents told the Meyers they could rent the timeshare out for profit and that maintenance fees would only increase slightly.  Westgate agents told the Meyers that they could always sell the timeshare and that Westgate had buyers waiting.  If they wanted to sell, they should go back to Westgate to give them a better deal.

231.    The Meyers felt pressured to take the deal in a presentation that lasted longer than 90-minutes.   Westgate told the Meyers that they would have vacations for life.

232.    The Meyers later learned all the foregoing representation made by the Westgate agent were false.  They were never able to rent out their property.

233.    The Meyers reasonably believed the deed that was recorded was evidence that they had purchased real property that could be sold later.

**EE.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Alvin Caprietta and Cheryl Jones**

234.    Cheryl Jones and Alvin Caprietta bought their Westgate timeshare ownership in Orlando, Florida in 2019.

235.    Westgate agents told the Cheryl Jones and Alvin Caprietta they could rent the timeshare out for a profit and that maintenance fees would only increase slightly, if at all. Westgate agents told Cheryl Jones and Alvin Caprietta that ownership was much cheaper than taking an independent vacation to the resort.

236.    Cheryl Jones and Alvin Caprietta reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

237.    Cheryl Jones and Alvin Caprietta felt pressured to take the deal after a presentation that lasted several hours. Westgate agents told Cheryl Jones and Alvin Caprietta that their purchase was a special deal that was only available that day. They were told that if they bought Westgate timeshare that day, they would get a discounted price. They were also told that being a timeshare property owner blessed them with benefits and access to Westgate property that is limited to timeshare owners only.

238.    Cheryl Jones and Alvin Caprietta later learned all the foregoing representations made by the Westgate agents were false. They were never able to rent out

their property and no Westgate agent was available to assist them. Maintenance fees increased substantially within the following year. Cheryl Jones and Alvin Caprietta have learned it is actually cheaper to book stays at the resort from other online booking websites. And that non-timeshare owners can use the same premises as they do.

239.    Cheryl Jones and Alvin Caprietta were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

**FF.    Specific Allegations of Wrongful Conduct by Westgate as to Plaintiffs Larry South and Jeanne South-Shawhan**

240.    Larry and Jeanne South-Shawhan, bought their Westgate timeshare ownership in Branson, Missouri in 2017, and were convinced by Westgate agents to upgrade on January 21, 2019 to a Westgate timeshare located in Florida, Kissimmee.

241.    Westgate agents told the Larry and Jeanne South-Shawhan they could rent the timeshare out for a profit and that maintenance fees would only increase slightly, if at all. Westgate agents told the Larry and Jeanne South-Shawhan that ownership was much cheaper than taking an independent vacation to the resort.

242.    Larry and Jeanne South-Shawhan felt pressured to take the deal in a presentation that lasted several hours. Westgate agents told the Larry and Jeanne South-Shawhan that their purchase was a special deal that was only available that day.

243.    Larry and Jeanne South-Shawhan later learned all the foregoing representation made by the Westgate agents were false. They were never able to rent out

their property and no Westgate agent was available to assist them Maintenance fees increased substantially within the following three years. The Larry and Jeanne South-Shawhan have learned it is actually cheaper to book stays at the resort from other online booking websites.

244.    South-Shawhan reasonably believed the deed that was recorded was evidence that they had purchased an interest in real property.

245.    South-Shawhan were not given any information about recission, exiting the time share, or that there was a statutorily required grace period for getting out.

## CLASS ALLEGATIONS

246.    Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and Missouri Supreme Court Rule 52.08, Plaintiffs identified above bring this action on behalf of themselves and all other persons similarly situated.  In particular, they seek to represent a class of:

> a.    All residents of the United States and its territories who purchased and/or upgraded from or to a Westgate a "floating use plan" vacation timeshare property at various Westgate Resorts from September 25, 2008 through the date of class certification.

247.    Excluded from the above definition are: Westgate; each of the companies' officers, directors, and employees; any entity in which one or more of the companies has a controlling interest or which has a controlling interest in one or more of the companies, and that entity's officers, directors, and employees; the judge assigned to this case and his or her immediate family; all expert witnesses in this case; and all persons who make a timely election to

be excluded from the class. Plaintiffs reserve their right to allege additional subclasses as warranted.

**Plaintiffs meet the prerequisites of Rule 23(a) and 52.08(a)**

248.   Numerosity.  The proposed class contains many thousands of individuals who have purchased timeshare properties at the Resort within the limitations period.  The proposed class are thus so numerous that joinder of all members would be impracticable.

249.   Commonality.  The answers to questions common to the class will drive the resolution of this litigation.  Specifically, resolution of this case will be driven by questions relating to Westgate's representations and statements about its timeshare properties at the Resort, Westgate's representations and statements about the proposed class members' ability to use those properties, Westgate's actions in selling those properties to the proposed class members, and Westgate's actions in making the timeshare properties available for use and enjoyment by the proposed class members.

250.   The common questions of law and fact include:

a.   whether Westgate omitted material information to the proposed class members about the nature of the timeshare purchase transaction; whether Westgate omitted material information to the proposed class members about the availability of timeshare properties for booking; whether Westgate produced a false impression in order to mislead the proposed class members or to obtain an undue advantage over them; whether Westgate owed a duty to the proposed class members to disclose omitted information; whether Westgate provided proposed class members a legally adequate timesharing plan; whether these omissions were material; whether Westgate breached its contracts with the proposed class;

whether Westgate breached it duty of good faith and fair dealing; whether
Westgate's policies and procedures limit the proposed class members' ability to
use and enjoy the timeshare properties they own; whether Westgate adequately
provided the proposed class with an up-to date public offering statement that
included, among other things, specific rescission language; whether Westgate
adequately provided the proposed class with a contract that included specific
rescission language; whether Westgate utilized a scheme to encourage its closing
officers to conceal required disclosures, including the Public Offering Statement,
from the proposed class members by hiding them in the folio, compensating them
on a commission basis, and failing to train and supervise them; whether
Westgate's actions were deliberate; whether Westgate's conduct was part of a
pattern and practice within Westgate that was designed to reduce the number of
contracts that are rescinded; whether any false warranties, misrepresentations, and
material omissions by Westgate caused the proposed class members' injuries;
whether Westgate fraudulently induced the proposed class members to sign the
contract and remain in the contract through the rescission period, and whether
Westgate otherwise defrauded the proposed class members; and whether
Westgate should be required to disgorge profits to the proposed class members.

251.   Typicality.  Plaintiffs have the same interests as all members of the class they
seek to represent, and all of Plaintiffs' claims arise out of the same set of facts and conduct as all
other members of the class.  Plaintiffs and all proposed class members purchased timeshare units
at the various Westgate Resorts.  All of the claims of Plaintiffs and the proposed class members

arise out of Westgate's omissions of material facts and other wrongful conduct regarding the nature and availability of the timeshare properties it sold to members of the potential class, and its policies and procedures regarding marketing, selling, and facilitating Plaintiffs' and the proposed class members' use of those properties.

252.    Adequacy.  Plaintiffs will fairly and adequately represent and protect the interest of the proposed class members:  Plaintiffs' interests align with those of the class members, and Plaintiffs have no fundamental conflicts with the class.  Plaintiffs have retained counsel competent and experienced in class action consumer fraud litigation, who will fairly and adequately represent the class.

### Plaintiffs meet the prerequisites of Rule 23(b)(2) and 52.08(b)(2)

253.    Westgate has acted and refused to act on grounds that apply generally to the class, so injunctive relief is appropriate with respect to the entire class.  An injunction should be issued declaring that Plaintiffs and proposed class members have a right to rescind the timeshare purchase.  Westgate should be enjoined from using folders containing secret pockets, utilizing a "delayed closing" deed delivery system that invites fraud, violating the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq. and the  Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

### Plaintiffs meet the prerequisites of Rule 23(b)(3) and 52.08(b)(3)

254.    Predominance and Superiority.  The common questions of law and fact enumerated above predominate over the questions affecting only individual members of the

class, and a class action is superior to other methods, for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Westgate has acted in a uniform manner with respect to the Plaintiffs and proposed class members.

255.    Westgate Defendants are sophisticated parties with substantial resources, while proposed class members are not, and prosecution of this litigation is likely to be expensive. Because the economic damages suffered by any individual class member may be relatively modest compared to the expense and burden of individual litigation, and because individual suits pursuing those damages would burden the courts and take many years to complete, it would be impracticable for the many thousands of proposed class members to seek redress individually for Westgate's wrongful conduct as alleged herein.

256.    The fraudulent conduct and ongoing harm to potential class members described above counsel in favor of swiftly and efficiently managing this case as a class action, which preserves judicial resources and minimizes the possibility of serial or inconsistent adjudications. Plaintiffs and proposed class members have all suffered and will continue to suffer harm and damages as a result of Westgate's unlawful and wrongful conduct. Absent a class action, class members will continue to be restricted from using their timeshare properties and incur monetary damages, and Westgate's misconduct will continue without remedy, while its ill-gotten profits will grow at the expense of class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no undue difficulty in the management of this litigation as a class action.

**The proposed class is ascertainable.**

257.    The class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class. The class consists of

purchasers and owners of Westgate timeshare properties in the floating use plan at the Resort, and class membership can be determined using contracts, deeds, receipts, ownership documentation, communications, and records in Westgate's and other databases.

## STATUTES OF LIMITATION, FRAUDULENT CONCEALMENT, AND ESTOPPEL

### Discovery Rule

258.    The causes of action did not accrue until Plaintiffs and Class Members discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Westgate.  Plaintiffs and Class Members had no realistic ability to discern the true nature and value of their timeshare property purchases because Westgate's subsequent actions and omissions defined Plaintiffs' ability to use and enjoy their properties.

### Fraudulent Concealment

259.    Any applicable statutes of limitation have been tolled by Westgate's knowing, active, and ongoing concealment and denial of the material facts as alleged herein.  Westgate is a sophisticated party with superior knowledge of complex real estate and business transactions. Westgate was and is under a continuous duty to disclose to Plaintiffs and Class Members the material facts alleged herein, and Plaintiffs and Class Members reasonably relied on Westgate's knowing, affirmative, and ongoing concealment.

260.    Plaintiffs and the class have been kept ignorant by Westgate of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

### Estoppel

261.    Westgate was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the timeshare properties and transactions as

alleged herein.  That concealment is ongoing.  Plaintiffs and Class Members reasonably relied on Westgate's knowing failure to disclose and/or active concealment of those facts.  Westgate is estopped from relying on any statutes of limitation in defense of this action.  Additionally, Westgate is estopped from raising any defense of laches due to its own conduct as alleged herein.

262.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Westgate:

a.    Who: Westgate, including each of the alter ego Defendants identified in this Complaint, and their agents, servants, and employees utilized a scheme to encourage the active concealment of legally required disclosures (including but not limited to the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare transactions from Plaintiffs and Class Members while simultaneously representing that Plaintiffs could use and enjoy their timeshare units whenever they wished, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Westgate responsible for such decisions, but they include the specific individuals identified in paragraphs 151-154, and Westgate officials David A. Siegel and Richard Siegel.

b.    What: Westgate knows but fails to adequately disclose to purchasers that: they are not purchasing a share in a specific unit but are instead buying into a "floating use plan," in which each timeshare owner's fractional interest is diluted many times more than if that person purchased the right to use a particular unit; because Westgate artificially restricts the availability of Resort properties, they

will not be able to use an expected Resort property when desired, rendering the "floating use plan" inadequate in violation of Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, and Tennessee Code Tenn. Code. Ann. § 66-32-107; Westgate encourages and/or allows its commission-based sales and closing agents to use a "secret pocket" to conceal legally required disclosures about the purchasers' rights, including their statutory right to rescind their purchase, in violation of Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.620, and Tennessee Code Tenn. Code. Ann. § 66-32-112(9); Westgate fails to deliver recorded warranty deeds to owners in a timely fashion, or in some cases at all.

c.      When: Westgate concealed material information starting no later than July 1, 2008, and on an ongoing basis, and continuing to this day, as alleged above. Westgate has not adequately disclosed the truth about the true nature and availability of timeshare properties at the Resort, nor purchasers' legal rights including the right to rescind the transaction and receive a warranty deed, to anyone outside of Westgate. Westgate has never taken any action to inform consumers about the true nature and availability of the timeshare properties at the Resort, or purchasers' rights with respect to the transactions. And when consumers complained to Westgate about the unavailability of properties, Westgate denied any knowledge of or responsibility for the problem, in many cases attempting to sell purchasers new or upgraded timeshare properties.

d.      Where: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in its communications with Plaintiffs and Class Members and made

contrary representations about the nature and availability of the timeshare properties.  Plaintiffs are aware of no document, communication, or other place or thing, in which Westgate adequately disclosed the truth about the lack of availability of timeshare properties to anyone outside of Westgate.  Even where certain legal disclosures were included in the fine print of a sales contract or other purchase document, the documents themselves were often concealed from Plaintiffs and Class Members by commission-based sales and closing agents through the use of a folio containing a secret pocket and the other high-pressure sales tactics described herein, including statements from licensed sales agents which materially contradict the disclosure.

e.      How: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times, even though it knew about the lack of availability of timeshare properties due to Westgate's artificial restriction of them, and about the legally required disclosures (including the right to rescind), and knew that this information would be important to a reasonable consumer.  Westgate concealed this information by using high-pressure sales tactics, commission-based sales agents, and a black folio containing a secret pocket which closing agents could use so that purchasers would not be able to find material information (including legally required disclosures) relating to their timeshare transaction.

f.      Why: Westgate actively concealed material information about the timeshare transactions, the legally inadequate floating use plan, the purchasers' ability to use and enjoy their purchase, and each purchaser's right to rescind the

transaction for the purpose of inducing Plaintiffs and Class Members to purchase timeshare properties and, once they owned timeshare properties, to purchase additional timeshare properties and services from Westgate.  Had Westgate disclosed the truth, for example in its sales pitches, advertisements, or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought timeshare properties (including by exercising their right to rescind their purchase contracts), or would have paid less for them.

## **FORCE AND EFFECT OF CONTRACTS**

263.    Westgate's contracts with purchasers are either void ab initio or voidable and should be rescinded and avoided.

264.    Westgate's contracts with purchasers are void ab initio because they are premised upon a fraud, as more fully detailed herein, and because Westgate does not give purchasers a reasonable opportunity to know the contract's character or essential terms.  Westgate agents often utilize an electronic signature process that automatically applies purchasers' signatures and initials to dozens of pages of contract documents that purchasers are not permitted to adequately read and review.  These signatures are ineffective as a matter of law.

265.    Westgate's contracts with purchasers should be rescinded and avoided because they violate statutes enacted for the protection of the public interests and specifically for the protection of timeshare purchasers, including but not limited to the Missouri Merchandising Practices Act, Mo. Code Ann. §  407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq., and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., as more fully detailed herein.

266.    Westgate's contracts with purchasers should be rescinded and avoided because they are based on fraudulent omissions including the failure to disclose to purchasers, inter alia, that they are not purchasing a share in a specific unit, that Westgate oversells the Resort, that purchasers cannot reasonably reserve and use their timeshare unit, and that purchasers have a statutory right to rescind the contract, all as more fully detailed herein.  Additionally, Westgate's bargaining power is far superior to that of purchasers, and it enters into timeshare contracts by unconscionable means, including under circumstances where Westgate has undue influence over purchasers, and/or circumstances that constitute duress and/or an abuse of economic power, as more fully detailed herein.  For all these reasons, Westgate's contracts with purchasers should be rescinded and avoided.

## COUNT I-VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT AND MISSOURI TIME-SHARING REGULATION
### (Against all Defendants)

267.    Plaintiffs hereby re-allege and incorporate by reference verbatim all of the previous allegations of this petition as if the same were fully set forth herein.

268.    At all relevant times there was in effect Missouri Merchandising Practices Act, Mo. Code Ann. § 407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq.

269.    Section 407.630.1 of the Missouri Time-Sharing Regulation provides, in pertinent part,  A time-share plan or time-share property is merchandise under the provisions of this chapter and the sale or offering for sale of such plans or property shall be subject to the provisions of sections 407.010 to 407.140, unless otherwise specifically provided in sections 407.600 to 407.630.

270.     Section 407.025.1 of the M.M.P.A provides, in pertinent part: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice.

271.     Defendants constitutes "persons," as defined by Section 407.010(5) of the Act, and as referenced in Section 407.025.1 of the Act.

272.     Defendants have sold and/or financed "merchandise" in "trade" or "commerce" in the State of Missouri, as those terms are defined by Section 407.010 of the Act. Specifically, Defendants have sold and/or leased timeshares, a type of merchandise under the Act, in their trade and commerce in the State of Missouri.

273.     In selling and financing timeshares in the State of Missouri, Defendants have used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts relating to its merchandise, all in violation of the Act. Specifically, Defendants have engaged in unlawful practices in one or more of the following ways:

a.      Concealing, suppressing, and/or omitting material facts about the nature of the timeshare purchase transaction.

b.      Violating the duty of good faith in negotiating in solicitation, negotiation, and performance in connection with the advertisement or sale of merchandise in violation of 15 C.S.R. 60-8.040.

c.      Advertising, marketing, and/or promoting Time-share interests for sale to Plaintiffs and the Class as a legally adequate timesharing plan.

d.      Providing or assisting in obtaining financing through predatory lending to facilitate the purchase of timeshares to Plaintiffs and The Class; and

f.      Other actions which will be further discovered.

274.    Defendants knew at the time the timeshare interests were sold to the Plaintiffs and the Class that the ability to use and enjoy the timeshare properties was limited by Defendants policies and procedures.

275.    Section 407.025.1 of the Act further provides, in pertinent part:

Any person who purchases…merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money…as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller…resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees…and may provide such equitable relief as it deems necessary and proper.

276.    At all relevant times, Plaintiffs purchased the timeshares at issue for "personal family or household purposes."

277.    Defendants intended that Plaintiffs and other members of the Class rely on their misrepresentations and omissions.

278.    As a proximate result of Defendants' misrepresentations, omissions and unlawful practices, Plaintiff and other members of the Class suffered an ascertainable loss of money by paying, and financing, the purchase price of a timeshare As such, Plaintiffs and

other members of the Class are entitled to bring this action to recover, inter alia, their actual damages, punitive damages, and attorneys' fees available under the Act.

279.    At all times herein, Defendants intentionally engaged in the unlawful practices enumerated above. Further, Defendants acted in reckless or conscious disregard of the interests of Plaintiffs and other Class members, perpetrating their unlawful practices in a willful, wanton, and malicious manner, such that an imposition of punitive damages is warranted.

## COUNT II-VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981
### The Secret Pocket
### (Against all Defendants)

280.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

281.    Tenn Code. Ann. §66-32-101, et seq., entitled the Tennessee Time-share Act of 1981 (the "Tennessee Time-share Act"), regulates sellers of time-share interests, and this statute applies to and governs the conduct of the Defendants.

282.    Tenn. Code Ann. §66-32-112 affirmatively requires Westgate to provide Plaintiffs with the Public Offering Statement for the Resort.  Tenn. Code Ann. §66-32-112 provides that a public offering statement "must contain" or "fully and accurately disclose" fifteen different categories of factual information, including, but not limited to, the name and address of the developer, a description of the building units (including completion dates), the type and number of units, a budget and information regarding fees that will be charged, a list of liens and encumbrances, and specific rescission language.

283.    Tenn. Code Ann. §66-32-112(9) requires a time-share developer to include the following language in its Public Offering Statement:

> A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

284.    Tenn. Code Ann. §66-32-114 provides that a time-share purchase contract is voidable until the purchaser has received the Public Offering Statement.  Tenn. Code Ann §6632-116 requires Westgate to amend its Public Offering Statements to report any material changes to the information required by Tenn. Code Ann. §66-32-112.

285.    Tenn. Code Ann. §66-32-118 provides the Plaintiffs with a claim for relief, including punitive damages and attorney's fees, for Westgate's failure to provide the Public Offering Statement.  Tenn. Code Ann. §66-32-119 contemplates a private right of action for rescission and damages.

286.    Tenn. Code Ann. §66-32-121(a) provides that the Tennessee Real Estate Commission may adopt rules and regulations "in furtherance of the objectives" of the Tennessee Time-share Act.  Pursuant to Tenn. Code Ann. §66-32-121(a), the Tennessee Real Estate Commission has adopted various rules which were in effect at the time of the transaction described in this Complaint.  These rules include, inter alia, the following:

**1260.06.02 RECEIPT OF PUBLIC OFFERING STATEMENT**.  Before transfer of a time-share interval and no later than the date of any sales contract, the developer shall obtain from the purchaser a signed and dated receipt for the public offering statement (and any amendments and supplements thereto) provided in accordance with Tenn. Code Ann. §66-32-112.  **The receipt shall specify the number of pages in the public offering statement as filed with the Commission**.  The developer shall retain such receipt for a period of four (4) years from the date thereof.

...

**1260.06.04 DISCLOSURE OF RESCISSION RIGHTS.**

The following statement shall appear in boldface and conspicuous type in:

(1) Every public offering statement; and

(2) **Every contract for the sale of a time-share interval, immediately above the space reserved for the signature of the purchaser:**

"You May Cancel a Contract to Purchase a Time-Share Interval within Ten (10) Days from the Date of the Signing of the Contract, Where You Have Made an On-Site Inspection of the Time-Share Project Before Signing the Contract, and, if You Have Not Made Such an Inspection, within Fifteen (15) days from the Date of the Signing of the Contract.  If You Elect to Cancel, You May Do So by Hand Delivering Notice to the Seller at [insert address] within the Designated Period, or by Mailing Notice to the Seller (or His Agent for Service of Process) by Prepaid United States Mail at [insert address] Postmarked Anytime within the Designated Period."

(Emphasis added.)

287.    In short, The Tennessee Time-Share Act establishes very clear requirements regarding the delivery of proper public offering statements and purchase contracts to time-share purchasers.  Westgate was required to provide the Plaintiffs with an up-to-date public offering statement that included, among other things, specific rescission language.

288.    Westgate was also required to provide the Plaintiffs with a contract that included specific rescission language.

289.    By using a folio containing a secret pocket, compensating closing agents on commission, and encouraging and/or allowing them to hide the public offering statement and the contract in a secret pocket, Westgate willfully circumvented these requirements.

290.    This conduct is part of a pattern and practice within Westgate that is designed to reduce the number of contracts that are rescinded.  Specifically:

A. Westgate designs and/or buys folios that contain a secret or hidden pocket.

B. Westgate utilizes a compensation system that penalizes its closing agents when customers rescind their contracts.

C. Sales at Westgate often follow a predictable pattern in that there is typically a lengthy and high-pressure sales pitch by the sales agent or agents assigned to a particular customer, followed by a closing with a different closing agent.  The sales agents do not typically attend the closing.

D. By the time of the closing, the customers are necessarily tired and worn down from the sales pitch.

E. During the closing, customers are presented with numerous documents to sign in short order, with minimal or incorrect explanation by the closing officer, and without the opportunity to fully review the documents. Documents signed at closing might typically include a settlement statement, power of attorney, allonge, acknowledgement of representations, truth in lending disclosure, acknowledgment of recording, and other documents.

G. Following the closing, the closing officer typically takes all of the closing documents that have been signed away to be copied.

H. Later, the purchasers are presented with a black folio to conclude the sales process. Typically, the black folio contains numerous documents, including, but not limited to, sales brochures, maps, resort directories, information regarding Interval International, and other booklets and brochures. Defendants incentivize the closing agent and/or sales staff to a) not mention or downplay that the purchasers have a statutory right of rescission; b) encourage the purchasers to sign the purchase contract and public offering statement receipt without fully examining the purchase contract and the public offering statement, and c) place the purchase contract and the public offering statement in the secret pocket so that the purchasers will not realize they are in possession of these documents, and will not recognize that they have a statutory right of rescission.

291.    Westgate's use of a secret or hidden pocket is well known among Defendants' sales staff, who sometimes refer to the pocket as the "secret pocket," and it is the subject of numerous consumer complaints and internet posts. See Brinkmann,

"Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30,
2015), available at https://www.orlandosentinel.com/business/brinkmann-on-business/os-
westgate-resortscancellation-20150930-post.html.

292.    This process was followed in Plaintiffs' experience at Westgate.  Plaintiffs
were worn down by lengthy, high-pressure sales pitches, and were not provided adequate
disclosures about their rights or their purchase.

293.    Plaintiffs, despite exercising reasonable diligence, did not know that certain
disclosures were mandated by Tennessee law and they did not know that their contract and
their public offering statement were often hidden in the secret pocket.  Plaintiffs did not
realize that they were missing documents, and they were not told that they had a statutory
right of rescission. By utilizing a system whereby closing agents use folios containing a
secret pocket, which incentivizes the closing agents to avoid giving the Plaintiffs the
disclosures that they are required by law to give, Westgate willfully violated the Tennessee
Time-share Act.

294.    All of Westgate's sales agents and closing agents' actions were in the course
and scope of their employment with Westgate and for the benefit of Westgate as well as for
themselves, and Westgate is liable for their actions under the doctrine of respondent
superior.

295.    Accordingly, for its various violations of the Tennessee Time-share Act and
the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-
share Act, all as described herein, Defendants are liable to the Plaintiffs.  Specifically,

pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorney's fees, and other relief.

## COUNT III-VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981
### (Against all Defendants)

296.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

297.    In addition to the provisions discussed in Count I, the Tennessee Time-share Act, Tenn. Code Ann. §66-32-102, defines "advertisement" to include "any...verbal... offer by an individual..."

298.    Tenn. Code Ann. §66-32-132(1) provides that no advertising for the sale of a time-share shall contain any representation regarding the availability of a resale or rental program.

299.    Tenn. Code Ann. §66-32-132(2) provides that no advertising for the sale of a time-share shall C=contain an offer or inducement to purchase which purports to be limited as to quantity or restricted as to time unless the numerical quantity and/or time applicable to the offer or inducement is clearly and conspicuously disclosed.

300.    Tenn. Code Ann. §66-32-132(3) provides that no advertising for the sale of a time-share shall contain any statement regarding the investment merit or profit potential of a time-share interval unless it has been approved by the State.

81

301.    Tenn. Code Ann. §66-32-132(9) provides that no advertising for the sale of a time-share shall misrepresent the nature or extent of any services incident to the time-share project.

302.    Tenn. Code Ann. §66-32-132(11) provides that no advertising for the sale of a time-share shall make any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits, or obligations under the purchase contract or the Time-share Act.

303.    Defendants violated these provisions of the Tennessee Time-share Act by omitting, failing to make, or hiding material facts and required disclosures, all as described in this Complaint. Specifically, Defendants utilize folders containing a secret pocket, compensate their sales and closing agents on a commission basis, encourage and/or allow them to conceal material facts from consumers regarding the lack of unit availability due to Defendants' practice of overselling the Resort, delay the frequent deliveries of deeds, fail to disclose consumers' statutory rights to rescind, and other material facts alleged in this Complaint.

304.    Westgate's sale and closing agents made these representations in the course and scope of their employment with Westgate, and for Westgate's benefit.  Accordingly, Westgate is liable for their actions pursuant to the doctrine of respondeat superior.

305.    Upon information and belief, Defendants also violated Tenn. Code Ann. § 66-32-113 and its implementing regulations (Tenn. Comp. R. & Regs. 1260-06-.03) by

failing to deposit into and maintain funds paid by timeshare purchasers in an escrow account in this state, for the duration of the cancellation period.

306.    Accordingly, for their various violations of the Tennessee Time-share Act and the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-share Act, all as described herein, Defendants are liable to Plaintiffs.  Specifically, pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorneys' fees, and other relief.

## <u>COUNT IV-UNJUST ENRICHMENT</u>
### **(Against all Defendants)**

307.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

308.    Plaintiffs and Class Members conferred benefits upon Westgate in the form of down payments, monthly mortgage payments, recurring maintenance fee payments, and additional fee and membership payments for property at the Resort and membership in Westgate's timeshare and other programs.

309.    Those payments were made with the reasonable expectation that Westgate was selling timeshare properties that could be used and enjoyed by Plaintiffs as represented by Westgate agents, and that Westgate was complying with the Missouri Merchandising Practices Act, The Missouri Time-Sharing Regulation, the Tennessee Time-Share Act and the Tennessee Consumer Protection Act.

310.    It would be unjust to permit Westgate to keep the payments made by Plaintiffs and Class Members because Westgate induced Plaintiffs and Class Members to make those payments by failing to disclose the facts material to the transactions.

311.    Plaintiffs, on behalf of themselves and the proposed Class, seek restitution.

## COUNT V-FRAUDULENT MISREPRESENTATION BY OMISSION
### (Against all Defendants)

312.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

313.    Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

314.    Westgate represented to the Plaintiffs and Class Members that as timeshare owners, they would have no difficulty using their timeshare and would have ample access to reservations.

315.    Westgate represented that it was a timeshare seller in Tennessee, meaning it had an affirmative duty under the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq., to make certain disclosures, as described in Counts I and II, incorporated by reference herein. Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: reasonable arrangements for management and operation of the time-share program, the type

84

and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

316.    Westgate was required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

317.    Westgate utilized a scheme to confuse consumers regarding their rights and avoid making required disclosures of material fact while selling the timeshares to Plaintiffs and Class Members.

318.    In carrying out the above-described scheme and failing to make the above described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

319.    Westgate intended for the Plaintiffs and Class Members to rely on its representations of material fact when the Plaintiffs and Class Members purchased timeshare interests, and Plaintiffs and Class Members did indeed rely on its representations.

320.    Specifically, Westgate agents failed to disclose material facts to Plaintiffs Jeffrey Kellough and Emily Kellough in connection with their timeshare purchase in 2015.

Among these facts, Westgate failed to adequately disclose that: the Kelloughs were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Kelloughs ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Kelloughs had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Kelloughs, as more fully described above.

321.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Wendell Bowsher and Barbara Bowsher in connection with their timeshare purchase in 2003 and the upgrade to their ownership in 2018.   Among these facts, Westgate failed to adequately disclose that: the Bowshers were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Bowshers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Bowshers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Bowshers, as more fully described above.

322.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Brian Hearn and Kathleen Hearn in connection with their timeshare purchase in 1995 and the multiple upgrades to their ownership between 2002 and 2018.  Among these facts, Westgate failed to adequately disclose that:  the Hearns were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the

their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Hearns from utilizing their timeshare property; the Hearns had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Hearns, as more fully described above.

323.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Shirley Acree and James Acree in connection with their timeshare purchase in 2018. Among these facts, Westgate failed to adequately disclose that: the Acrees were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Acrees from utilizing their timeshare property; the Acrees had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Acrees, as more fully described above.

324.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Rita Baker in connection with her timeshare purchase from a Westgate agent while in Orlando, Florida. Among these facts, Westgate failed to adequately disclose that: Ms. Baker was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Ms. Bakers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Baker had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Baker, as more fully described above.

325.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Cassandra Butler in connection with her timeshare purchase over 10 years ago and the upgrade to her ownership in 2016.  Among these facts, Westgate failed to adequately disclose that:  Ms. Butler was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Ms. Butlers ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Butler had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Butler, as more fully described above.

326.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Ulysee Taylor and Lemoria Taylor in connection with their timeshare purchase in 2017. Among these facts, Westgate failed to adequately disclose that:  the Taylors were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Taylors ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Taylors had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Taylors, as more fully described above.

327.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Dana Coffman in connection with his timeshare purchase over 25 years ago and the upgrade to his ownership in 2017.  Among these facts, Westgate failed to adequately disclose that:  Mr. Coffman was not purchasing the right to use a specific unit or even type of unit, but was

instead purchasing into a "floating use plan" that would not guarantee Mr. Coffman's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Coffman from utilizing his timeshare property; Mr. Coffman had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Coffman, as more fully described above.

328.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs James and Marieth Mitchell in connection with their timeshare purchases many years ago.  Among these facts, Westgate failed to adequately disclose that:  the Mitchells were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Mitchells ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Mitchells from utilizing their timeshare property; the Mitchells had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Mitchells, as more fully described above.

329.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Donald Kolander in connection with his timeshare purchase in 2007.  Among these facts, Westgate failed to adequately disclose that:  Mr. Kolander was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Mr. Kolander's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare property; Mr. Kolander had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Kolander, as more fully described above.

330.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Kenneth and Dorisona Nadermann in connection with their timeshare purchase seven years ago.  Among these facts, Westgate failed to adequately disclose that:  the Nadermanns were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee the Nadermanns ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Nadermanns had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Nadermanns, as more fully described above.

331.     Similarly, Westgate agents failed to disclose material facts to Plaintiff Charles Richardson in connection with his timeshare purchase starting over 20 years ago and the several upgrades to his ownership throughout that time.  Among these facts, Westgate failed to adequately disclose that:  Mr. Richardson was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Mr. Richardson's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare property; Mr. Richardson had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Richardson, as more fully described above.

332.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Irving Cummings and Grace Cummings in connection with their timeshare purchase in 2002 and the upgrade to their ownership in 2013. Among these facts, Westgate failed to adequately disclose that: the Cummings were not purchasing the right to use a specific unit or even type

of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Cummings had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Cummings, as more fully described above.

333.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Bonnie Jernigan in connection with her timeshare purchase in 2016 and the upgrade to her ownership in 2017.  Among these facts, Westgate failed to adequately disclose that:  Ms. Jernigan was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee Ms. Jernigan's ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; Ms. Jernigan had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Jernigan, as more fully described above.

334.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Charles Orr and Reba Orr in connection with their timeshare purchase in 2000.  Among these facts, Westgate failed to adequately disclose that:  the Orrs were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Orrs had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Orrs, as more fully described above.

335.     Similarly, Westgate agents failed to disclose material facts to Plaintiff John Wright in connection with his timeshare purchases in 2013.  Among these facts, Westgate failed to adequately disclose that:  Mr. Wright was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing him from utilizing his timeshare property; Mr. Wright had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Wright, as more fully described above.

336.     Similarly, Westgate agents failed to disclose material facts to Plaintiffs Clifford Koleski and Donna Koleski in connection with their timeshare purchase in 2015. Among these facts, Westgate failed to adequately disclose that:  the Koleskis were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Koleskis had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Koleskis, as more fully described above.

337.     Similarly, Westgate agents failed to disclose material facts to Plaintiff Paige Smith in connection with her timeshare purchases in 2019.  Among these facts, Westgate failed to adequately disclose that:  Ms. Smith was not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold

the Resort, preventing Ms. Smith from utilizing her timeshare property; Ms. Smith had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Ms. Smith, as more fully described above.

338.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Walter Washington in connection with his timeshare purchase years ago and the upgrade to his ownership in 2019.  Among these facts, Westgate failed to adequately disclose that:  Mr. Washington was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Washington from utilizing his timeshare property; Mr. Washington had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Washington, as more fully described above.

339.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Veronica and William Mauck in connection with their timeshare purchase years ago and the upgrade to their ownership in 2015.  Among these facts, Westgate failed to adequately disclose that:  the Maucks were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Maucks from utilizing their timeshare property; the Maucks had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Maucks, as more fully described above.

340.    Similarly, Westgate agents failed to disclose material facts to Plaintiff John Thomas, Sr. in connection with his timeshare purchase in 2017 and the upgrade to his

ownership in 2018.  Among these facts, Westgate failed to adequately disclose that:  Mr. Thomas was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Thomas from utilizing his timeshare property; Mr. Thomas had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Thomas, as more fully described above.

341.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Thomas and Jacquie Haynes in connection with their timeshare purchase years ago and the upgrade to their ownership in 2019.  Among these facts, Westgate failed to adequately disclose that:  the Haynes were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Haynes from utilizing their timeshare property; the Haynes had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Haynes, as more fully described above.

342.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Jeffrey Gay and Karen Gay in connection with their timeshare purchase years ago in Orlando, Florida, and the upgrade to their ownership in 2009.  Among these facts, Westgate failed to adequately disclose that:  the Gays were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Gays from utilizing their timeshare property; the Gays had a right

94

to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Gays, as more fully described above.

343.    Similarly, Westgate agents failed to disclose material facts to Plaintiff Raymond Dage in connection with his timeshare purchase in 1992 and the upgrade and transfer of his ownership in 2014.  Among these facts, Westgate failed to adequately disclose that:  Mr. Dage was not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee his ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing Mr. Dage from utilizing his timeshare property; Mr. Dage had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Mr. Dage, as more fully described above.

344.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Stanley Comer and Patricia Comer in connection with their timeshare purchase in 2019. Among these facts, Westgate failed to adequately disclose that:  the Comers were not purchasing the right to use a specific unit or even type of unit, but instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Comers from utilizing their timeshare property; the Comers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Comers, as more fully described above.

345.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Troy Thompson and Martha Thompson in connection with their timeshare purchase in 2015.

Among these facts, Westgate failed to adequately disclose that: the Thompsons were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Thompsons from utilizing their timeshare property; the Thompsons had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Thompsons, as more fully described above.

346.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Mac Williams and Colleen Williams in connection with their timeshare purchase starting over 20 years ago and the several upgrades to their ownership throughout that time.  Among these facts, Westgate failed to adequately disclose that: the Williams were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing the Williams from utilizing their timeshare property; the Williams had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Williams, as more fully described above.

347.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Rodney Meyer and Katharine Meyer in connection with their timeshare purchase in 2018. Among these facts, Westgate failed to adequately disclose that: the Meyers were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort;

96

Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Meyers had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Meyers, as more fully described above.

348.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Alvin Caprietta and Cheryl Jones in connection with their timeshare purchase in 2019. Among these facts, Westgate failed to adequately disclose that: the Jones were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Jones had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Jones, as more fully described above.

349.    Similarly, Westgate agents failed to disclose material facts to Plaintiffs Larry South and Jeanne South-Shawhan in connection with their timeshare purchases in 2018. Among these facts, Westgate failed to adequately disclose that: Larry South and Jeanne South-Shawhan were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; Larry South and Jeanne South-Shawhan had a right to rescind the contract, as described in the legally required Public Offering Statement,

which Westgate by its agents concealed from the Larry South and Jeanne South-Shawhan, as more fully described above.

350.    Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.  Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made. Defendants intended to induce reliance upon the representations.  Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law.  Plaintiffs' reliance was reasonable under the circumstances.

351.    Plaintiffs were injured and damaged by virtue of their reasonable reliance on these representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the timeshares.

352.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Westgate sales agent work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

353.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondent superior.

354.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Missouri and Tennessee law.

355.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

## COUNT VI-FRAUD IN THE INDUCEMENT
### (Against all Defendants)

356.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

357.    Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

358.    Defendants had an affirmative duty under Missouri Merchandising Practices Act, Mo. Code Ann. § 407.010, et seq., the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.600, et seq., and the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, et seq.  to make certain disclosures, as described in Counts I and II, incorporated by reference herein.  Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

359.    The Westgate defendants were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

360.    By utilizing a scheme to avoid making the above-described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

361.    Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature and were made to induce the Plaintiffs to enter a contract and purchase a time-share

interest.  Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made. Defendants intended to induce reliance upon the representations.  Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law.  Plaintiffs' reliance was reasonable under the circumstances.

362.    Plaintiffs were injured and damaged by virtue of their reliance on these representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the time-shares.

363.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Westgate sales agent work on commission and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

364.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondent superior.

365.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Tennessee law.

366.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants

## COUNT VII-NEGLIGENT MISREPRESENTATION BY OMISSION

### (Against All Defendants)

367.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

368.    Westgate sales agents are licensed as time-share salesmen by the State of Tennessee.  In addition, Westgate (through related entity Westgate Marketing, LLC) serves as a broker for these licensees.  Defendants are agents, servants, partners, aiders and abettors, co-conspirators, and/or joint ventures and subject to a unity of interest, ownership, and control, and are alter egos of one another, as more fully alleged above.

369.    Defendants and Westgate sales agents are governed by the Missouri Merchandising Practices Act, the Missouri Time-Sharing Regulation, the Tennessee Real Estate Commissions.

370.    Section 407.025.1 of the M.M.P.A provides, in pertinent part: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in…the state of Missouri, is declared to be an unlawful practice.

371.    the Missouri Time-Sharing Regulation, Mo. Ann. Stat. § 407.625, requires the timeshare developer prior to the execution of any contract between the purchaser and the timeshare developer, to deliver to the purchaser certain information, and the purchaser shall certify, in writing, to the receipt of such written information. As relevant to this lawsuit, the required information includes:

a.    A complete and accurate description of all limitations, restrictions, or priorities employed in the operation of the exchange program, including, but not limited to, limitations on exchanges based on seasonality, unit size, or levels of occupancy, expressed in boldfaced type, and, in the event that such limitations, restrictions, or priorities are not uniformly applied by the exchange program, a clear description of the manner in which they are applied;

b.    The number of units in each property participating in the exchange program which are available for occupancy and which qualify for participation in the exchange program, expressed within the following numerical groupings: 1-5, 6-10, 11-20, 21-50, and 51 and over; and

103

c.     The number of owners with respect to each time-share plan or other

property which are eligible to participate in the exchange program expressed

within the following numerical groupings: 1-100, 101-249, 250-499, 500-999,

and 1,000 and over; and a statement of the criteria used to determine those

owners who are currently eligible to participate in the exchange program;

372.     Tenn. Code Ann. §62-13-403 provides, in relevant part, that real estate licensees

in Tennessee owe "all parties" to a real estate transaction the following duties:

**§62-13-403.  Duties owed to all parties**

A licensee who provides real estate services in a real estate transaction
shall owe all parties to the transaction the following duties, except as
provided otherwise by §62-13-405, in addition to all other duties
specifically set forth in this chapter or the rules of the commission:

(1) Diligently exercise reasonable skill and care in providing services to
all parties to the transaction.,

(2) Disclose to each party to the transaction any adverse facts of which the
licensee has actual notice of knowledge.,

(3) Maintain for each party to a transaction the confidentiality.,

(4) Provide services to each party to the transaction with honesty and good
faith.,

(5) Disclose to each party to the transaction timely and accurate
information regarding market conditions that might affect the transaction
only when information is available through public records and when the
information is requested by a party.,

(6) Timely account for trust fund deposits...; and

373.    Defendants and their sales agents also had a duty to disclose material facts that affected the timeshare property's value and were not known or reasonably discoverable by Plaintiffs and the proposed class through the exercise of ordinary diligence.

374.    As described in this Complaint, Defendants and their sales agents breached these duties, and, in fact, intentionally defrauded the Plaintiffs rather than provide them with accurate information honestly and in good faith.  Defendants, in the course of their business and in the course of a transaction in which they had a pecuniary interest, supplied false information for the guidance of Plaintiffs and proposed class members, omitted material facts about the transaction affecting the property's value, and failed to exercise reasonable care or competence in obtaining or communicating that information.

375.    Defendants and their sales agents knew, among other facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  They failed to adequately disclose these material facts to Plaintiffs, as more fully described herein.

376.    Defendants and their sales agents did this for their own pecuniary benefit, in the form of commissions and increased payments to Westgate.

377.    Defendants' omissions of material fact described herein constituted material inducements to Plaintiffs and proposed class members to purchase timeshare property at Westgate Smoky Mountain Resort, to pay other charges and fees at the time of purchase, to

upgrade to purportedly superior properties, and to pay charges and fees during the period of ownership.

378.    Plaintiffs were entitled to rely upon the representations of the Defendants and their sales agents, given the respective position of the parties and the duties owed by real estate licensees and sellers of real property.  Ordinary diligence by Plaintiffs would not have revealed the undisclosed facts.  Plaintiffs and proposed class members were induced to act by the representations of Defendants and their sales agents, and did act, in ignorance of the falsity of the representations and with a reasonable belief that the representations were true. Plaintiffs' reliance was reasonable and justifiable, and caused them to be damaged.

379.    At the time, the statements omitting material facts were made, Defendants and their sales agents knew that they were false.  In short, Defendants and their sales agents deceived the Plaintiffs intentionally and for the purpose of closing the sale, for the benefit of themselves (via their commissions) and for the benefit of Westgate, breaching duties owed to Plaintiffs and proposed class members.

380.    For all of these reasons, the Contract should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs, and for punitive damages.

## COUNT VIII-BREACH OF CONTRACT
## (IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### (Against all Defendants)

381.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

382.    Plaintiffs and members of the proposed class contracted with Defendants to purchase timeshare properties at the various Westgate Resorts.

383.    Good faith is an element of every contract pertaining to the purchase of timeshare property.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

384.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Defendants breached their timeshare purchase contracts with Plaintiffs and proposed class members, and specifically the covenant of good faith and fair dealing, through Defendants' omissions, misrepresentations, and practices as alleged herein.

385.    Plaintiffs and proposed class members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

386.    Plaintiffs and proposed class members have sustained damages as a result of Defendants' breach of the contract.

387.     As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class members, and for punitive damages.

## COUNT IX-BREACH OF CONTRACT

### (Against all Defendants)

388.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

389.     Plaintiffs and members of the proposed class contracted with Defendants to purchase timeshare properties at the various Westgate Resorts.

390.     Defendants breached their timeshare purchase contracts with Plaintiffs and proposed class members through Defendants' omissions, misrepresentations, and practices as alleged herein, specifically including (but not limited to) Defendants' failure to adequately disclose to Plaintiffs and proposed class members that Westgate artificially restricted the availability of timeshare units, Defendants' scheme to avoid providing required disclosures, and Defendants' failure to provide the Plaintiffs and proposed class members the opportunity to use and enjoy their purchases.

391.     Plaintiffs and proposed class members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

392.     Plaintiffs and proposed class members have sustained damages as a result of Defendants' breach of the contract, including but not limited to the funds lost as described herein, and the lack of use and enjoyment of the timeshare properties purchased by Plaintiffs.

393.    As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class embers, and for punitive damages.

## COUNT X-CIVIL CONSPIRACY

### (Against all Defendants)

394.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

395.    Defendants agreed to join a conspiracy related to defrauding consumers in the purchase of timeshare properties seemingly, but not actually, in compliance with the law of Tennessee.

396.    Each Defendant exercised control over each other Defendant and/or all Defendants were under common control, see supra ¶¶ 48-50, in ways that will be revealed during discovery through the production of evidence that is presently in the exclusive control of Defendants.

397.    The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

398.    Defendants knew that the object of this conspiracy was to market and sell timeshare properties to Plaintiffs and proposed class members, without adequately disclosing, among other material facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  The objects of the conspiracy were fraud, breach of contract, unjust

enrichment, negligent misrepresentation, and/or violations of the Missouri Time-Sharing Regulations and the Tennessee Time-Share Act, as described more fully herein. Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

399.    Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

400.    As described above, Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy as described above.

401.    These unlawful acts proximately caused the damages suffered by Plaintiffs. Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## PRAYER FOR RELIEF

 In light of the foregoing, Plaintiffs respectfully request:

1. This action to be certified pursuant to Fed. R. Civ. P. 23 (b)(2), (b)(3), and (c)(4) and Missouri Supreme Court Rule 52.08 as a class action on behalf of the proposed Class and subclasses, as warranted; that the named Plaintiffs be appointed as Class Representatives; and that counsel below be designated Class Counsel.

2. That an injunction be issued declaring that Plaintiffs' and proposed class members' have a right to rescind the timeshare purchase contracts and that Defendants must disgorge profits received from them; and enjoining Defendants from using folders containing secret pockets, utilizing a "delayed closing" deed

delivery system that invites fraud, violating the Missouri Merchandising Practices Act, Missouri Timeshare Regulations, and the Tennessee Time-Share Act as applicable in each case, continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

3. Judgment to be entered against all Defendants on all causes of action and damages suffered.

4. Plaintiffs and the Class be awarded the full, fair, and complete recovery for all causes of action and damages suffered.

5. Plaintiffs and the Class be awarded rescission, damages, punitive damages, restitution, attorneys' fees, and costs.

6. Plaintiffs and the Class be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and such other relief that the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

Dated: June 1, 2020

Respectfully submitted,

Consumer Law Protection Lawyers

By: /s/Michael Sokolik
Michael Sokolik MO Bar #44057
Attorney at Law
8600 Daniel Dunklin Blvd.
Pevely, MO 63070
(314)-686-4630
michaels@consumerlawprotection.com

*Attorney for Plaintiffs and the Proposed Class*